**Mary BROWN, et al., Plaintiffs,**

v.

**COUNTY OF SAN JOAQUIN, et al., Defendants.**

**No. CIV.S–83–1464 RAR.**

United States District Court, E.D. California.

Jan. 22, 1985.

---

Deborah M. DeBow, DeBow & Kendrick, Sacramento, Cal., Carole Shauffer, Youth Law Center, San Francisco, Cal., for plaintiffs.

George H. Cunningham, Deputy County Counsel, Stockton, Cal., for defendants.

## MEMORANDUM AND ORDER

RAMIREZ, District Judge.

The question presented by the pending cross-motions for summary judgment is whether a foster parent, a foster child, or both, is entitled to procedural due process before a county welfare department[1] removes the child from the home, thus terminating the foster parent—foster child relationship. Because California law already requires county welfare departments to provide procedural due process to foster families in most circumstances,[2] the precise issue raised by this action is the constitutionality of the California regulation which excepts foster families similarly situated to the plaintiffs from entitlement to procedural due process. Cal. Dept. of Social Services Manual § 30–378.23.[3]

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Mary Brown is a white, middle-aged woman residing in the County of San Joaquin, State of California. Ms. Brown is a licensed day-care provider and a licensed foster parent.[4]

Plaintiff "Jenny"[5] was born on October 29, 1979. Her biological mother proved to be neglectful, as a result of which Jenny came to the attention of the child welfare services unit of the San Joaquin County Human Services Agency. The County determined that Jenny was a child in need of protection and care, Cal.Welf. & Inst.Code § 300, and, on March 7, 1980, when Jenny was four months old, the County placed Jenny in the home of Ms. Brown. Shortly thereafter Jenny was adjudicated a dependent child of the court. Cal.Welf. & Inst. Code § 360(b). It appears from the record that Jenny's biological mother was white and that she was unwilling or unable to name Jenny's father. However, the parties

---

1. County welfare departments are responsible for the delivery, in accordance with regulations promulgated by the State Department of Social Services, of services to foster families. Cal. Welf. & Inst.Code § 10800, Cal.Dept. of Social Services Manual §§ 10–005.13, 10–052, 10–100, *et seq.*

2. Cal.Dept. of Social Services Manual §§ 30–348, 30–378.

3. The court is cognizant of 28 U.S.C. § 2403(b) and E.D.Cal.L.R. 133(b), and the notice requirements contained therein. When the complaint was originally filed, the plaintiffs named as defendants, *inter alia,* the State of California and the State Department of Social Services. Thereafter, the state defendants sought and obtained a dismissal with respect to plaintiffs' 42 U.S.C. §§ 1983, 1981 claims, and the plaintiffs subsequently stipulated to a dismissal of their Title VI claims against the state defendants. Although the complaint is not couched in terms of an express challenge to the constitutionality of § 30–378.23, this court is of the opinion that the complaint gave adequate notice of the issue to the State so as to comply with 28 U.S.C. § 2403(b).

4. With certain exceptions not relevant hereto, no person may provide either foster care or day care to infants and children without a license issued by the State. "Foster care" is defined as 24-hour, residential care. Cal.Health & Safety Code § 1502(a)(5); Cal.Welf. & Inst.Code § 11400(e); Cal.Dept. of Social Services Manual § 30–002(k). "Day care" is defined as non-medical care provided on less than a 24-hour basis. *See* Cal.Health & Safety Code § 1502(a)(3).

5. "Jenny" is not the true name of the infant plaintiff. Since, it is the policy of the State of California to protect the anonymity of dependent children, *cf.* Cal.Welf. & Inst.Code § 346, the court granted the plaintiffs' petition to permit Jenny to appear by a fictitious name.

seem to be agreed that, judging by appearances, Jenny's father is black.

Jenny lived in Ms. Brown's home from March 7, 1980, until July 6, 1983, a period of 3¼ years. Sometime in 1981 the County became convinced that the reunification of Jenny with her biological parent(s) would never occur. The County therefore became obligated to find a permanent placement for Jenny. Cal.Welf. & Inst.Code § 16508. *See also* Cal.Welf. & Inst.Code §§ 366.2, 366.25. In July of 1981, when Jenny was approximately 1½ years old and had been living with Ms. Brown for approximately sixteen months, the County invited Ms. Brown to apply to adopt Jenny. Ms. Brown accepted that invitation and commenced completing the application forms and attending the pre-adoption classes prescribed by the County. In June of 1982, approximately one year after the County had invited Ms. Brown to apply to adopt Jenny, the County informed her that her application had been denied.

Ms. Brown responded to this denial by filing a petition to adopt Jenny.[6] Cal.Civ. Code § 224n. The County moved to dismiss the petition on the ground that Ms. Brown lacked standing to file such a petition. In this regard, § 224n of the California Civil Code provides, in relevant part:

> No petition may be filed to adopt a child ... except by the prospective adoptive parents with whom the child has been placed for adoption by the department....

The County argued that Ms. Brown was not a "prospective adoptive parent" within the meaning of the statute because the County had not placed Jenny with her *for adoption,* and thus Ms. Brown was, *ipso facto,* ineligible to file a petition to adopt.

The trial court was persuaded by the County's argument, granted the County's motion to dismiss, and entered a judgment of dismissal. Ms. Brown did not file an appeal from the court's dismissal of her petition. Instead she filed a petition for a writ of mandate in the District Court of Appeal. *See San Diego Department of Public Assistance v. Superior Court,* 7 Cal.3d 1, 101 Cal.Rptr. 541, 496 P.2d 453 (1972); *C.V.C. v. Superior Court,* 29 Cal. App.3d 909, 106 Cal.Rptr. 123 (1973). Although the appellate court initially granted a stay, permitting Jenny to remain in Ms. Brown's home pending its evaluation of the petition, eventually the appellate court denied the petition and dissolved the stay. Ms. Brown's petition for a hearing in the California Supreme Court met a similar fate, and on July 6, 1983, Jenny was removed from Ms. Brown's custody. The County has now placed Jenny elsewhere, but the particulars of that disposition are unknown to the court at this time. On December 6, 1983, Ms. Brown commenced the instant litigation in federal court seeking damages and injunctive and declaratory relief. On December 11, 1984, plaintiff filed a first amended complaint which in effect substantially narrowed the contentions of the original complaint.

## II. RES JUDICATA

The defendants have asserted that the plaintiffs' action is barred by the doctrine of *res judicata,* relying on *Migra v. Warren City School District Board of Education,* —— U.S. ——, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). The defendants contend that the plaintiffs' present action is barred because Ms. Brown could have and should have joined her present claim for procedural due process to her petition to adopt Jenny.[7]

---

**6.** At the time that Ms. Brown filed her petition to adopt, formal proceedings to have Jenny declared free from parental custody and control, Cal.Civ.Code §§ 232, *et seq.,* had not been completed. Thus whatever its other defects, Ms. Brown's petition was premature. Jenny was declared free from parental custody and control by an Order of the Superior Court entered January 7, 1983.

**7.** For obvious reasons, Ms. Brown was the only petitioner in the state court proceedings. The child who is the subject of the petition is not considered a petitioner. The defendants have not explained why Jenny's action is barred by Ms. Brown's petition to adopt.

In *Migra* the United States Supreme Court decided that the doctrine of *res judicata* applies as fully in federal civil rights actions as it applies in other actions. Thus a federal district court hearing a civil rights action is required to give prior judgments of a state court precisely the same preclusive effect that such judgments would be given by the rendering state court. The question thus presented is what preclusive effect, if any, would the courts of the State of California give the judgment of dismissal issued in the adoption proceedings instituted by Ms. Brown?

California adheres to the "primary rights" doctrine, whereby each invasion of a primary right gives rise to a separate and distinct claim. *Agarwal v. Johnson*, 25 Cal.3d 932, 160 Cal.Rptr. 141, 603 P.2d 58 (1979); *Slater v. Blackwood*, 15 Cal.3d 791, 126 Cal.Rptr. 225, 543 P.2d 593 (1975). Furthermore, California law permits, but does not require, the joinder of different claims. Cal.Civ.Proc.Code § 427.-10. Thus under California law, a plaintiff may file as many actions as he has separate and distinct claims.[8] The preclusive effect of the judgment of dismissal in the adoption proceedings must therefore be determined by inquiring whether the primary right asserted by Ms. Brown in this action is the same as or different from the primary right asserted in the petition to adopt.

As both courts and commentators have noted, framing the question as one of "primary rights" does not inevitably yield self-evident answers. *City of Los Angeles v. Superior Court*, 85 Cal.App.3d 143, 153, 149 Cal.Rptr. 320 (1978). It is clear that a primary right is not defined by the relief sought, *Busick v. Workmen's Compensation Appeals Board*, 7 Cal.3d 967, 104 Cal. Rptr. 42, 500 P.2d 1386 (1972), or by the legal theory on which the plaintiff bases his claim. *Panos v. Great Western Packing Co.*, 21 Cal.2d 636, 134 P.2d 242 (1945). Rather a primary right is defined either by the harm suffered by the plaintiff, *Agarwal v. Johnson, supra, Slater v. Blackwood, supra,* or by the substantive right allegedly invaded. *Mattson v. City of Costa Mesa*, 106 Cal.App.3d 441, 164 Cal.Rptr. 913 (1980); *Stafford v. Yerge*, 129 Cal. App.2d 165, 276 P.2d 649 (1954).

It is difficult, of course, to analyze the adoption proceedings in terms of harm suffered. By filing the petition to adopt Jenny, Ms. Brown was not seeking to redress an injury inflicted upon her by another. The adoption proceedings were at most the assertion of a single substantive right—the right to adopt Jenny. It is clear that this is *not* the substantive right asserted by Ms. Brown in the present litigation. In this action Ms. Brown is asserting that, regardless of her entitlement, or lack thereof, to adopt Jenny, as a foster parent she is entitled to procedural due process before the County removes her foster child from her home and destroys the foster parent—foster child relationship.

The court concludes that the California courts, if presented with the question, would hold that Ms. Brown is not "splitting a cause of action" but is bringing independent actions on independent claims.[9] Thus

---

**8.** This rule does not have quite the horrific ramifications that might be surmised at first blush. The doctrine of collateral estoppel will bar relitigation of issues actually litigated in the first action, and the statute of limitations will usually force a plaintiff to file all of his actions against a particular defendant within a short period of time, thus making consolidation possible. *See generally* B. Witkin, *California Procedure,* "Pleading," § 243, p. 1916 (2d ed. 1971).

**9.** The court notes that in a memorandum of points and authorities submitted on behalf of Ms. Brown in the adoption proceedings, considerable reference was made to both California

and federal cases discussing the requirements of procedural due process. The court concludes that this material cannot be considered to have been a claim for procedural due process before the termination of the foster parent—foster child relationship. First, it seems self-evident that the claims actually put in issue are those stated by the complaint or, as in this case, the petition. Second, the memorandum must be read in light of the earlier stipulation of the parties that "the only issue before the court would be, does Mrs. Mary Brown have a right to proceed with this petition?" Although the memorandum is not a model of pleading, it is most plausibly construed as an argument that there is

the California courts would not consider the judgment of dismissal in the adoption proceedings to have a claim preclusive effect. Accordingly, the present action is not barred by the doctrine of *res judicata*.[10]

## III. PROCEDURAL DUE PROCESS

As a general rule, an individual is entitled to procedural due process before prejudicial governmental action occurs only if the governmental action would cause a deprivation of life, liberty, or property. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Goodisman v. Lytle*, 724 F.2d 818 (9th Cir.1984); *Powderly v. Schweiker*, 704 F.2d 1092 (9th Cir.1983). In the instant case, then, plaintiffs can demonstrate entitlement to procedural due process before the County removes the child from the home only if either or both of them can demonstrate a liberty or property interest in the continuation of the foster parent—foster child relationship.

Quite clearly the County's removal of Jenny from Ms. Brown's home did not deprive either plaintiff of a so-called property interest. However expansively one reads the term "property," it cannot include the foster parent—foster child relationship. Such a relationship, if entitled to any protection at all, is protected because of the profound emotional and psychological bonds existing between the foster parent and the foster child, not because of any economic or proprietary interest of either party. The precise question, therefore, is whether there is a protected liberty interest in the continuation of a foster parent—foster child relationship.

### A

One source for the identification of protected liberty interests is state law. *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 845–846, 97 S.Ct. 2094, 2110–111, 53 L.Ed.2d 14 (1976) (hereinafter *Smith v. OFFER*). When a state by its enactments creates the expectation that certain interests will be protected absent specified good cause, then the state must afford the individual procedural due process before upsetting that expectation. *Id.* California law does create the expectation that a foster family relationship of significant duration will be protected from arbitrary destruction.

The first and paramount goal of California law is the reunification of children with their natural parents:

It is the policy of the Legislature that foster care should be a temporary method of care for the children of this state, that children have a right to a normal home life, that reunification with the natural parent or parents or another alternative permanent living situation such as adoption or guardianship are more suitable to a child's well-being than is foster care, and that this state has a responsibility to attempt to ensure that children are given the chance to have a happy and healthy life, and that, to the extent possible, the current practice of moving chil-

California precedent for affording persons with a "psychological parent" relationship extra-statutory rights and that the statutory term "prospective adoptive parent" therefore ought not to be interpreted in a technical sense. It seems apparent from the memorandum that Ms. Brown's counsel believed that unless Ms. Brown were found to be a "prospective adoptive parent" within the meaning of the statute, then the termination of her relationship with Jenny, and Jenny's with her, was inevitable and irremedial, hence the rhetorical flourishes. It should be noted that Ms. Brown's present counsel did not represent her in the state court proceedings.

10. This disposition of the defendants' *res judicata* defense makes it unnecessary to discuss the implications of a dismissal for lack of standing. *See* B. Witkin, *California Procedure,* "Judgment," § 174, p. 3315–16 (2d ed. 1971) ("No difficulty is encountered with a judgment entered after sustaining a special demurrer for formal defects such as ... incapacity to sue.... It is not res judicata.") Similarly, it is unnecessary to discuss the preclusive effects of the appellate courts' denial of Ms. Brown's petition for the issuance of an extraordinary writ. *See Consumers Lobby Against Monopolies v. Public Utilities Commission*, 25 Cal.3d 891, 901 n. 3, 160 Cal.Rptr. 124, 603 P.2d 41 (1979).

dren receiving foster care services from one foster home to another until they reach the age of majority should be discontinued.

Cal.Welf. & Inst.Code § 396. Consistent with these goals, the legislature has mandated that each county institute a Family Reunification Program:

The Family Reunification Program is designed to provide *time-limited* foster care services to prevent or remedy neglect, abuse, or exploitation, when the child cannot safely remain at home, and needs *temporary* foster care, while services are provided to reunite the family.

Cal.Welf. & Inst.Code § 16501.2 (emphasis supplied). *See also* Cal.Welf. & Inst.Code § 361(e).

California law bespeaks, however, a recognition that the goal of family reunification and the goal of a permanent and stable home are often in conflict. California law reconciles these conflicts by making familial reunification a primary goal but imposing a time limit within which reunification must be achieved. When events demonstrate that the goal of family reunification is unrealistic, then the focus is placed on finding a permanent, stable home for the child.

Family reunification services must be provided to both parents and a child who has been removed from their custody after an adjudication of dependency, but services must be provided for only twelve, or at most eighteen, months. Cal.Welf. & Inst. Code § 361(e); Cal.Welf. & Inst.Code § 16507. The juvenile court must hold a "status review hearing" not later than six months after the original order removing the child from his parents' custody. Cal. Welf. & Inst.Code §§ 366, 366.2. In the event that the child cannot then be re-turned to his parents, the juvenile court must expressly inform the parents that unless the problems which led to the adjudication of dependency are not sufficiently resolved to permit reunification within an additional six months, proceedings to terminate their parental rights permanently may be instituted. Cal.Welf. & Inst.Code § 366.2(e). Finally, the juvenile court is required to conduct a "permanency planning hearing" for a dependent child not later than twelve months after the original order removing the child from his parents' custody. Cal.Welf. & Inst.Code § 366.25. If the juvenile court then determines that reunification is neither presently possible nor substantially probable, the court is required to fashion an alternate, permanent plan for the child's future. Cal.Welf. & Inst.Code § 366.25(d).

California law recognizes and affords protection to the interest of foster parents and foster children in an enduring relationship only once the goal of reunification has largely been abandoned in favor of finding a permanent and stable home for the child. At that point the existence of a stable and loving relationship between the foster parent and the foster child limits the options available to the juvenile court charged with the responsibility of formulating a permanent plan for the child. In fashioning a permanent plan for the child's future, the juvenile court is required to consider three possible alternatives in descending order of desirability—adoption, guardianship, and other. The availability of each of these alternatives, however, is circumscribed when the child is living with a foster parent to whom he is deeply attached and who is willing and able to provide a stable and permanent home. Cal.Welf. & Inst.Code § 366.25(d).[11] Thus, although a juvenile court must order the commencement of

---

**11.** Section 366.25 and companion sections of the California Welfare and Institutions Code were enacted as emergency measures in 1982 and became effective immediately. They were enacted to effect a substantial reform in the foster care services delivery system in California and to bring California into compliance with P.L. 96–272, 42 U.S.C. § 670, *et seq. See generally* English, A., *Foster Care Reform* (Wash-ington, D.C. Legal Services Corp. Research Institute 1981); *Senate Preprint 13, Senate Preprint 14, Master Plan for Children: Hearings before the Senate Select Committee on Children and Youth* (November 1980). Section 366.25 became law just shortly after the County informed Ms. Brown that her application to adopt Jenny had been denied and while Jenny was still living with Ms. Brown.

proceedings to terminate the rights of the biological parent for a child who is otherwise adoptable, it may not do so if the child is residing with a beloved, loving, responsible foster parent who is nevertheless unable formally to adopt the child. Cal.Welf. & Inst.Code § 366.25(d)(1)(C).[12] Similarly, in the case of a non-adoptable child, the juvenile court is required to consider the creation of a guardianship for the child, but may not do so if the child is living with a beloved, loving, responsible foster parent who is nevertheless unable formally to become the child's guardian. Cal.Welf. & Inst.Code § 366.25(d)(2). Finally, the preservation of a subsisting foster parent—foster child relationship is to be preferred over any other alternatives:

> When the minor is in a foster home and the foster parents are willing and capable of providing a stable and permanent environment, the minor shall not be removed from the home if the removal would be seriously detrimental to the emotional well-being of the minor because the minor has substantial psychological ties to the foster parents.

Cal.Welf. & Inst.Code § 366.25(d)(3). Thus, by statute, the State of California has provided that the foster family relationship is entitled to recognition and protection.

California courts, too, have recognized that relationship and held it to be entitled to protection. In *In re B.G.*, 11 Cal.3d 679, 114 Cal.Rptr. 444, 523 P.2d 244 (1974), the late Justice Tobriner, with his customary eloquence, observed:

> The fact of biological parenthood may incline an adult to feel a strong concern for the welfare of his child, but it is not an essential condition; a person who assumes the role of parent, raising the child in his own home, may in time acquire an interest in the "companionship, care, custody, and management" of that child. The interest of the "de facto parent" is a substantial one, recognized by this court in *Guardianship of Shannon* (1933) 218 Cal. 490 [23 P.2d 1020] and by the courts of other jurisdictions and deserving of legal protection.

> . . . . .

> The status of the *de facto* parent received statutory sanction with enactment of the Family Law Act in 1969. Previously Civil Code section 138 distinguished only between awards of custody to parents and nonparents; the Family Law Act, in Civil Code section 4600, added the stipulation that when an award of custody to the parent would be detrimental next in order of preference stands "the person or persons in whose home the child has been living in a wholesome and stable environment."

(footnotes omitted). 11 Cal.3d at 692–93, 114 Cal.Rptr. 444, 523 P.2d 244. The court concluded by holding that the foster parent—foster child relationship was such that foster parents had a right to participate fully in all juvenile court proceedings affecting the placement of the child, including the status review hearing which occurs within six months of the original order removing the child from his parents' custody.[13] Cal.Welf. & Inst.Code § 366.2(b), (d). *See also Katzoff v. Superior Court*, 54 Cal.App.3d 1079, 127 Cal.Rptr. 178 (1976). Subsequently, California appellate courts have upheld the rights of foster parents in a variety of contexts. *See In re Phillip B.,*

---

**12.** Until recently the statute did not provide that foster parents to whom the child was deeply attached and who were both capable of providing a stable and permanent home and able to formally adopt the child were entitled to any preferential consideration as adoptive parents. This odd lacuna in the law has been remedied by Cal.Stats.1984, ch. 190, p. 234–37, § 1, effective January 1, 1985. Now loving, beloved, responsible foster parents are entitled to preferential consideration at every stage of the placement process.

**13.** The parties to this action have not supplied the court with a copy of the record of the proceedings regarding Jenny in the juvenile court. However, the court notes that the County did not inform Ms. Brown that her application to adopt Jenny had been denied until more than two years after the original dependency proceedings, presumably well after proceedings in the juvenile court had been completed.

139 Cal.App.3d 407, 188 Cal.Rptr. 781 (1983); *In re Lynna B.*, 92 Cal.App.3d 682, 155 Cal.Rptr. 256 (1979). *See generally* Harris, A., ed., *California Juvenile Court Practice: Dependent Minors, Status Offenders* (CEB 1981, Supp.1984).

■ The court concludes that California law does create the expectation in both foster parents and foster children that, absent good cause, a subsisting relationship of mutual love and affection will be permitted to continue. California law recognizes a hierarchy of interests. During the first twelve months in which a child is separated from his parents, every effort is made to restore the *status quo ante.* During that period, foster care is regarded exclusively as a temporary expedient. Once the prompt reunification of the child with his biological parents is conceded to be an impossibility, however, then the primary goal is the provision of a stable and permanent home for the child. At this point, the law recognizes that emotional ties between the foster parent and the foster child may have come into existence, and that the child's best interests may be served by protecting those emotional ties. The court therefore concludes that no foster parent or foster child can, on the basis of California law, form the expectation of an indefinite relationship during the period when familial reunification efforts are occurring but that both foster parents and foster children are permitted by California law to expect an enduring relationship once efforts at familial reunification have been abandoned.

As noted above, the applicable California regulations do require the counties to provide procedural due process to foster families before removing the child from the home. Cal.Dept. of Social Services Manual §§ 30–348, 30–378, 30–448. Those regulations contain certain exceptions, however: no pre-removal notice need be provided to foster families if the child is in imminent danger, if the foster parents have waived their right to pre-removal notice,[14] if a court has expressly ordered the child's removal, if the foster parents' license has been revoked, or if the child is being reunited with its parents after a voluntary placement. Cal.Dept. of Social Services Manual § 30–348.2. The grievance review otherwise available is not provided when any of the exceptions to § 30–348 apply, when the decision to remove the child is the result of the regular administrative review,[15] or when the child is being removed "for direct placement into an adoptive home." [16] *Id.* at § 30–378.2. It is this last provision on which the County relies to justify its denial of a pre-separation hearing for Ms. Brown and Jenny.[17]

**14.** Waivers cannot exceed six months from the date of placement and are authorized only as exceptions to routine practice, "to meet unusual individual exigencies." Cal.Dept. of Social Services Manual § 30–348.11.

**15.** An elaborate administrative review every six months is mandated by both state and federal law. 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(6); Cal.Welf. & Inst.Code § 16503; Cal.Dept. of Social Services Manual §§ 30–390, 30–490, *et seq.* Although there is some ambiguity about the availability of judicial review of the administrative determination, *see* Cal.Dept. of Social Services Manual § 30–499.1, *cf.,* Cal.Civ.Proc.Code § 1094.5, the foster parents are entitled to full participation in the administrative proceedings. Cal.Dept. of Social Services § 30–494.14.

**16.** There are two other exceptions to the general obligation to provide grievance reviews to aggrieved foster parents, but neither of them has any application to the removal of the child from the home. The county need not provide a grievance review when the gravamen of the complaint is a challenge to the validity of a law or a statewide regulation or when the grievance is one for which a "state hearing," *see* Cal.Dept. of Social Services Manual § 22–101.31, is available. Cal.Dept. of Social Services Manual §§ 30–378.24, 378.25. A state hearing is not available to review a county decision to remove a foster child from his foster home. *Id.* at § 22–001.62.

**17.** The County also relies, albeit cursorily, on the exception in § 30–348.23: "A court has ordered the child's removal." The court order to which the County points is the order dismissing Ms. Brown's petition to adopt Jenny, but the County's reliance is misplaced. First, the Superior Court, in dismissing Ms. Brown's petition to adopt, only adjudicated Ms. Brown's standing to file such a petition; it did not adjudicate Jenny's best interests. Second, in concluding that the County was entitled to custody of Jenny, the Superior Court only affirmed the *status quo;* it did not order her removal from Ms. Brown's home. On the contrary, the court urged the

The occasions when a foster child may be removed from his foster home for direct placement in an adoptive home without procedural due process having been accorded the foster parents ought to be quite rare. Because California law protects the right of foster parents to participate in all judicial and administrative proceedings affecting the placement of their foster child, *In re B.G.*, 11 Cal.3d 679, 114 Cal.Rptr. 444, 523 P.2d 244, Cal.Welf. & Inst.Code §§ 366.2(b), 366.25(b), 16503, Cal.Dept. of Social Services Manual §§ 30–390, 30–490, 30–494.14, because California law requires frequent judicial and administrative review of all foster care placements, Cal.Welf. & Inst.Code §§ 366.25(a), 16503, Cal.Dept. of Social Services Manual §§ 30–390, 30–491.-12, and because California law expressly favors stable, enduring foster family placements over adoption, Cal.Welf. & Inst.Code §§ 366.25(d)(1)(C), it is difficult to imagine how a juvenile court decision to place the child for adoption in lieu of preserving the foster family relationship can ever be made without the full participation of the foster family.[18] Rare or commonplace, however, the removal of a foster child from a foster home without affording the foster parent the right to prove the satisfaction of the statutory criteria for the protection of the foster familial bonds—substantial psychological ties between foster child and foster parent and the foster parent's willingness and ability to provide the foster child with a stable and permanent home—amounts to the destruction of a state-created liberty interest without procedural due process.

Section 30–378.23, insofar as it operates to deprive foster families of a hearing on their right to the preservation of their familial relationship, is unconstitutional. Foster parents and foster children have been invited by Cal.Welf. & Inst.Code § 366.25 to believe that once efforts to reunite the child with the biological parents have been abandoned, and provided that the foster parents are willing and able to provide a permanent and stable home for the foster child, the familial relationship will be protected from disruption. California law thereby creates a liberty interest in the preservation of foster families. Having created an expectation of an enduring

County to reconsider Ms. Brown's application to adopt Jenny.

The exception created by § 30–348.23 must be understood in context. There is no need to provide foster parents with pre-removal notice and hearing if full due process has already been accorded. The Due Process Clause does not mandate duplicative procedures or idle ceremonies. *Ybarra v. Bastian,* 647 F.2d 891, 893 (9th Cir.1981). A court order for the removal of the child from the foster home presupposes a proceeding in which the best interests of the child were litigated and in which the foster parents were permitted to participate. Section 30–348.-23 may profitably be compared with § 30–348.-25, which excuses pre-removal notice to the foster parents if the child has been placed in foster care voluntarily. A biological parent who places his child in foster care voluntarily is entitled to remove his child from foster care at any time, but a biological parent whose child was placed in foster care as a result of a court order may obtain the return of his child only by court order. Thus §§ 30–348.23, 30–383.25 are complementary regulations, the former applying to children who are in foster care as a result of a court order under Cal.Welf. & Inst.Code § 361(c) and the latter applying to children who are in foster care as a result of a voluntary placement.

**18.** In Ms. Brown's case it is probable that she was denied the opportunity to prove the existence of the conditions precedent to the preservation of the foster family in preference to all other plans for the child's future because the statute explicitly providing protection for foster familial bonds, Cal.Welf. & Inst.Code § 366.-25(d), did not become law until 1982, presumably well after the juvenile court had ordered the County to find an adoptive home for Jenny. It is possible that Ms. Brown's situation is *sui generis,* but, judging by the statutory and regulatory scheme, it seems equally possible that other foster families could find themselves in the same predicament. A foster parent, believing that he will be permitted to adopt his foster child, may eagerly accede to the county's recommendation, made at the permanency planning hearing, that the child be placed for adoption. If the county subsequently denies the foster parent's application for adoption, plans the removal of the child from the foster parent's home for placement with county-designated prospective adoptive parents, and denies the foster parent's request for a pre-removal hearing on the strength of § 30–378.23, then the foster parent will be denied any opportunity to litigate his right, and the right of the foster child, to the preservation of the familial relationship.

relationship, the state and its political subdivisions must afford the parties to that relationship procedural due process.

### B

■ The Due Process Clause of the Fourteenth Amendment is a source of liberties protected by the requirement of predeprivation procedural due process independent of state law. *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254,. 63 L.Ed.2d 552 (1980). The identification of the precise contours of the liberties protected by the Constitution itself is not easy:

"Liberty" and "property" are broad and majestic terms. They are among the "[g]reat [constitutional] concepts ... purposely left to gather meaning from experience.... [T]hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged." *National Mutual Ins. Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 646, 69 S.Ct. 1173, 1195, 93 L.Ed.2d 1556 (Frankfurter, J., dissenting).

... "While this court has not attempted to define with exactness the liberty ... guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska,* 262 U.S. 390, 399 [43 S.Ct. 625, 626, 67 L.Ed. 1042]. In a Constitution for a free people, there can be no doubt that the meaning of "liberty" must be broad indeed. *See, e.g., Bolling*

*v. Sharpe,* 347 U.S. 497, 499–500 [74 S.Ct. 693, 98 L.Ed. 884]; *Stanley v. Illinois,* 405 U.S. 645 [92 S.Ct. 1208, 31 L.Ed.2d 551].

*Board of Regents v. Roth,* 408 U.S. at 571–72, 92 S.Ct. at 2705–706. It is now well-established, however, that "family rights" are among the liberties protected by the Fourteenth Amendment:

The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family—marriage, *e.g., Zablocki v. Redhail* [434 U.S. 374 [98 S.Ct. 673, 54 L.Ed.2d 618] (1978)]; childbirth, *e.g., Carey v. Population Services Int'l,* [431 U.S. 678 [97 S.Ct. 2010, 52 L.Ed.2d 675] (1977)]; the raising and education of children, *e.g., Smith v. Organization of Foster Families,* [431 U.S. 816 [97 S.Ct. 2094, 53 L.Ed.2d 14] (1977)]; and cohabitation with one's relatives, *e.g., Moore v. City of East Cleveland,* [431 U.S. 494 [97 S.Ct. 1932, 52 L.Ed.2d 531] (1977)]. Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.

*Roberts v. United States Jaycees,* —— U.S. ——, 104 S.Ct. 3244, 3250, 82 L.Ed.2d 462 (1984). "But is the relation of foster parent to foster child sufficiently akin to the concept of 'family' recognized in our precedents to merit similar protection?" *Smith v. OFFER,* 431 U.S. at 842, 97 S.Ct. at 2108.

The Court left that question undecided in *Smith v. OFFER.* However, the Court did observe that "the usual understanding of 'family' implies biological relationships," but that "biological relationships are not the exclusive determination of the existence of a family." [19] *Id.* at 844, 97 S.Ct. at

---

**19.** Recently the Court has suggested that a biological relationship is neither necessary nor suf-

ficient to create a protectible liberty interest in the care and custody of one's children. *Lehr v.*

2109. The marriage relationship, described by the Court as "the basic foundation of the family," is a contractual relationship, not a biological one. *Id.* at 843–45, 97 S.Ct. at 2109–110. The relationship between adopting parents and the adopted child is neither biological nor contractual, but simply human. The Court concluded:

> Thus the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of life" through the instruction of children, *Wisconsin v. Yoder,* 406 U.S. 205, 231–233 [92 S.Ct. 1526, 32 L.Ed.2d 15] (1972), as well as from the fact of blood relationship.

*Id.* at 844, 97 S.Ct. at 2109–110. In a hypothetical that is an exact analogue of the facts of this case, the Court observed:

> No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship. At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family.

(footnotes omitted). *Id.*

The Court also noted the existence of considerations that militated against treating a foster family in the same way as a biological family: the foster family, unlike the biological family, is a creature of state creation, and recognizing a foster parent or foster child's right to procedural due process might derogate the biological parents' right to the return of their child to their custody. Id. at 846–47, 97 S.Ct. at 2110–111. In California, the possibility of a derogation of the biological parents' rights is not realistic. As noted above, California

law specifically requires the natural parents to make diligent efforts to obtain reunification with their children; if the problems which necessitated the adjudication of dependency are not sufficiently resolved within one year of the removal of the child from the home, then the juvenile court must make an alternative, permanent plan for the child. Cal.Welf. & Inst.Code § 366.25. Similarly, a natural parent who voluntarily places his child in foster care must act diligently to restore the *status quo ante;* the county welfare departments are required to take affirmative steps to resolve the child's status after only six months of foster care. Cal.Welf. & Inst. Code § 16507.6. Thus a foster family's rights to procedural due process will not come into existence until after the natural parents have abdicated their responsibility to the child and necessitated a consideration of the alternatives. In any event, the problem of a conflict of rights can best be resolved by recognizing a hierarchy of rights.

■ Thus the ultimate question: is a relationship with the form and the function of a biological family entitled to the legal protections granted to a biological family despite the fact that the relationship is entirely a creature of state law? This court concludes that it is. It is artificial to treat a relationship that time and events have transformed into the most profound relationship known to mankind—mother and child—as the purely legal relationship it originally was. Reality controls; the emotional sustenance and enrichment, the very sense of self, derived from an intimate relationship with one's parent or one's child cannot be discounted by the niceties of the relationship's creation. In a series of cases decided since *Smith v. OFFER,* the Supreme Court has made it clear that the touchstone of protectible family rights is not nice legal distinctions or even simple biology, but the reality of family life. *Compare Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978)

*Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983).

*with Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), and *compare Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) *with Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).

More importantly, however much a foster parent's appreciation of the nature of the relationship can be tutored by the circumstances of its creation, it is obvious that a very young foster child is incapable of knowing that the foster parent—foster child relationship is different from a biological parent-child relationship. No one can caution an infant against loving the individual who provides for all of his needs, physical and emotional; *see generally,* Goldstein, J., *et al., Beyond the Best Interests of the Child* (2d ed. 1979); Bowlby, J. *Attachment & Loss* (1969–1983); Fraiberg, S., *The Magic Years* (1959); no one can instruct the infant foster child that his foster parent is not his real or natural parent; no one can diminish the infant foster child's feelings toward his foster parent and cause them to be distinguished from the feelings of an infant child to his natural parents.

In short, the court concludes that the foster family relationship is sufficiently similar to other familial relationships held by the Supreme Court to be entitled to constitutional protection. The court reaches this conclusion because the foster parent—foster child relationship has precisely the same form and content as a healthy biological parent-child relationship, and in the face of that reality, the circumstances of its creation are immaterial. That being so, before the state or any of its political subdivisions can end the relationship, it must provide the parties with procedural due process.

In reaching this conclusion, this court necessarily rejects the conclusions of the courts in *Kyees v. County Department of Public Welfare,* 600 F.2d 693 (7th Cir. 1979), and *Drummond v. Fulton County,* 563 F.2d 1200 (5th Cir.1977) (en banc). This court finds those decisions unpersuasive for two reasons. First, in both cases the court found that applicable state law,

unlike California law, neither created nor sustained the expectation that a mutually rewarding foster family relationship of sufficient duration would, absent good cause, be permitted to endure. Second, in both cases, the court treated the role of the state in the creation of the relationship as dispositive. This court regards such a conclusion as the product of an "over-reading" of *Smith v. OFFER.* In *Smith v. OFFER* the majority opinion identifies the role of the state in the creation of the relationship as a "consideration," a distinction between biological families and foster families, but not necessarily a dispositive difference. *Smith v. OFFER,* 431 U.S. at 845, 97 S.Ct. at 2110, *but see id.* at 856–61 (Stewart, J., concurring in the judgment). The majority in *Smith v. OFFER* had no occasion to decide if the distinction was ultimately dispositive, and for reasons fully explicated above, this court has concluded that it ought not be. This court believes that to conclude that the state's role in the creation of the foster family is controlling is to sanction the triumph of form over substance.

## IV. THE PROCESS DUE

None of the parties to this action has tendered any arguments on the appropriate scope and form of the process due, but in light of current California law, such an omission need not delay the resolution of this action. Although, as noted above, the current California regulations provide for a comparatively elaborate administrative proceeding to review a county's decision to remove a foster child from his foster home, Cal.Dept. of Social Services Manual § 30–378, this court reads California law to confide the duty and authority to determine the plan for a dependent child's future to the juvenile court. Cal.Welf. & Inst.Code § 366.25. This court is entirely confident that the Juvenile Court of San Joaquin County, with its expertise in proceedings involving dependent children, is fully capable of providing the plaintiffs herein with the procedural due process to which they are constitutionally entitled.

Although Cal.Welf. & Inst.Code § 366.25 establishes only two criteria for the protection of foster families—substantial psychological ties between the foster parent and the foster child, and the foster parent's willingness and ability to provide the foster child with a stable and permanent home—this court does not wish to imply that these need be the only considerations before the juvenile court. Had the hearing on the plaintiffs' right to an enduring relationship with each other been held before Jenny was removed from Ms. Brown's home, the situation would be otherwise, but the separation of Jenny and Ms. Brown occurred eighteen months ago. It is possible that the reunification of Jenny with Ms. Brown will be, despite the passage of time, in Jenny's best interests, but it is also possible that subsequent events have made Jenny's present placement the best alternative. In any event, given the present status of the parties, the lodestar for any permanent plan for Jenny is her best interests. The juvenile court is not required to determine who shall have custody of Jenny on the basis of a historical reality but on the basis of present reality.

## V. THE INDIVIDUAL DEFENDANTS

 On the suggestion of the court made pursuant to Federal Rule of Civil Procedure 16, the plaintiffs amended their complaint to delete their claims against the individual defendants in their individual capacities. The only claims against the individual defendants are asserted against them in their official capacities. However, regardless of the capacity in which the individual defendants are sued, they are not liable to the plaintiffs unless the plaintiffs prove that the individual defendants proximately caused the deprivation of constitutional rights of which the plaintiffs complain. *See Monell v. Department of Social Services,* 436 U.S. 658, 692, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), *Harris v. City of Roseburg,* 664 F.2d 1121 (9th Cir. 1981).

It is the obligation of the party moving for summary judgment to establish that there are no material issues of fact in dispute. *Aydin Corp. v. Loral Corp.,* 718 F.2d 897 (9th Cir.1983), F.R.Civ.P. 56. The plaintiffs herein have utterly failed to show who, if any, of the individual defendants was responsible for the deprivation of the procedural due process to which the plaintiffs were entitled. Similarly, the defendants have utterly failed to show that any of the named individual defendants were not responsible for the plaintiffs' deprivation. Accordingly, both parties' motions for summary judgment with respect to the individual defendants must be denied.

Good cause appearing therefor,

IT IS HEREBY ORDERED that the plaintiffs' motion for summary judgment against the County of San Joaquin and the San Joaquin County Human Services Agency be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that the County of San Joaquin and the San Joaquin County Human Services Agency initiate proceedings pursuant to Cal.Welf. & Inst. Code § 366.25 to determine a permanent plan for Jenny, plaintiff herein, wherein Mary Brown, plaintiff herein, will be permitted to show that there are substantial psychological ties between herself and Jenny, that she is able to provide a permanent and stable home for Jenny, and that the reunification of Jenny with her would be in Jenny's best interests. Said proceedings shall be commenced not more than forty-five (45) days and not less than ninety (90) days from the date of this Order. This court strongly urges the Juvenile Court of the County of San Joaquin to appoint Carole Shauffer of the Youth Law Center of San Francisco as counsel for Jenny and further strongly urges the Juvenile Court of the County of San Joaquin to permit Ms. Shauffer to have access to Jenny, so that she may obtain independent expert testimony on the present significance of Jenny's psychological ties to Ms. Brown and on Jenny's best interests.

IT IS FURTHER ORDERED that the plaintiffs' motion for summary judgment with respect to Harry Brodie, Don Pilcher, Joan Glissmayer, Karen Formosa, and Wendy Kersteins is DENIED without prejudice.[20]

IT IS FURTHER ORDERED that the defendants' motion for summary judgment with respect to the individually-named defendants be DENIED without prejudice.

IT IS FURTHER ORDERED that the defendants' motion for summary judgment with respect to the defense of *res judicata* be DENIED with prejudice.

IT IS FURTHER ORDERED that the preliminary injunction heretofore ordered, enjoining any proceedings to approve the adoption of Jenny, remain in effect until thirty (30) days after the issuance, by the Juvenile Court of the County of San Joaquin, of its order decreeing a permanent plan for Jenny.[21]

IT IS FURTHER ORDERED that the parties to this action inform the court immediately upon the conclusion of the permanency planning hearing, so that the court may then schedule a further status conference with respect to the matters not adjudicated by this Order.

IT IS SO ORDERED.

---

**20.** In light of the court's ruling, counsel for plaintiff should give serious consideration to the thought of dismissing the individually named defendants sued herein in their official capacity. Dismissal of said parties will permit the immediate entry of final judgment and permit the parties to take whatever appeals they feel appropriate in a timely fashion.

**21.** The court reminds counsel that any dissatisfaction with the results of the permanency planning hearing are to be addressed to the California appellate courts rather than this court.