Clark Davenport SNELL, et
al., Plaintiffs,

v.

Conley TUNNELL, et al., Defendants.

No. CIV.–87–1812–P.

United States District Court,
W.D. Oklahoma.

Oct. 28, 1988.

Allan Devore, Marjorie J. Ramana, Ted Sherwood, Oklahoma City, Okl., for plaintiffs.

Charles Lee Waters, David Brown, Roger Stuart, Richard Freeman, Oklahoma City, Okl., Louis W. Bullock, Tulsa, Okl., for defendants.

## ORDER

PHILLIPS, District Judge.

## I. INTRODUCTION

Clark Snell is a former alcoholic and convicted felon who, along with his wife Sharon, has provided a home in recent years for dozens of children from the Oklahoma City area. The Snell home, aside from serving as the Snells' personal residence, serves children as a family foster home, group home and emergency shelter. Estimates of the number of children staying at the residence at any one time have varied from one dozen to three dozen. Residing at the home at various times have been the natural children of Mrs. Snell, children adopted by the Snells, children under various forms of guardianships by the Snells, children in the process of being adopted by the Snells, and children abandoned by their natural parents and left with the Snells.

The home has unquestionably provided a valuable service to many of the children who have passed through the Snell home in recent years. The home has also been controversial. Prior to the initiation of this litigation, the Oklahoma Department of Human Services ("DHS") received numerous complaints concerning the Snell home, ranging from inadequate supervision, neglect, and improper licensing procedures to child abuse. It is also clear that certain DHS employees and certain Oklahoma City police officers have harbored suspicions, though without any evidentiary basis whatsoever, that the Snells were involved in child pornography and child prostitution. Needless to say, the tensions between the Snells and certain DHS employees who have monitored the Snell home have been strained for some time.

This is a Section 1983 civil rights action, arising out of the removal of seven children by DHS employees and Oklahoma City police officers from the Snell home on August 26, 1987. On that date, DHS filed an Application with the Honorable Sidney Brown, Presiding Judge of the Juvenile Division of the District Court of Oklahoma County, leveling a number of allegations against the Snells.[1] Paragraph one of that Application stated: "DHS has received allegations of neglect, lack of supervision, child prostitution and child pornography in the Snell's home in violation of 21 O.S. §§ 843–48." Defendants' Ex. "5", Ex Parte Order issued August 26, 1987. Paragraphs two through four of the Application alleged that DHS had information that the Snells were operating an unlicensed facility (paragraph 2); that DHS had been unable to complete the child abuse investigation due to lack of cooperation by the Snells (paragraph 3); that DHS was concerned for the welfare of the children in the Snell home and that the number and identity of the

---

1. This Court previously dismissed Judge Brown as a defendant in this case on January 29, 1988.

Order of February 3, 1988.

children in the Snell home were unknown (paragraph 4).

The Application requested Judge Brown to "provide whatever assistance and orders the Court deems appropriate in order to protect children and assist DHS in completing child abuse and licensing investigations of the Snells home." Defendants' Ex. "4", Application filed Aug. 26, 1987. Judge Brown promptly issued an order which, among other things, ordered "any police officer or law enforcement agency ... to take into custody all of the children at Clark and Sharon Snell's home at 8513 Tiffany, Oklahoma City, Oklahoma County, Oklahoma ... if Clark and Sharon Snell and/or their agents are unable to produce valid Court Orders signed by a Judge pertaining to each child in their home." Defendants' Ex. "5", Ex Parte Order issued Aug. 26, 1987.

Pursuant to this Order, Oklahoma City Police Sgt. George Johnson, accompanied by defendants Sieck and Levingston, went to the Snell home at approximately 6:00 p.m. on August 26, 1987 and identified seven children for whom the Snells had no such documentation. Officer Johnson, after consultation with the DHS employees, determined that the children for whom no documentation could be produced should be removed, and promptly supervised the removal of these children from the Snell home to the Oklahoma County Juvenile Shelter.

As discussed in more detail below, the circumstances surrounding the Application precipitating Judge Brown's order of August 26, 1987 were extraordinary to say the least. This was the first time DHS had ever filed an application of this character. State law and long established policies envision such matters being presented by DHS to the court through the District Attorney's Office. The District Attorney's Office, however, was openly hostile to DHS' requests to pursue the Snell matter because of the lack of evidence. Likewise, another judge was contacted by DHS officials prior to presenting the Application to Judge Brown. The other judge also declined to take action. Finally, the Application was unusual in that it was totally baseless with respect to the child pornography and prostitution allegations.

At a hearing held in the Juvenile Division of the Oklahoma County District Court within one week of the events of August 26, DHS was unable to come forward with any evidence to support the child prostitution and pornography allegations. It now appears that the DHS official who prepared the Application, Pam Padley, got her information from an Oklahoma City Police Detective, J.M. Einhorn, who in turn claimed that he had been provided his information concerning the pornography and prostitution allegations from defendants Asbury, Swepston, Sieck and Levingston, and an FBI agent, Leslie Treece. At any rate, no evidence has ever been produced to substantiate the pornography and prostitution allegations against the Snells.

This highly emotional and much publicized litigation has been long and tortuous, and has resulted in the filing of a summary judgment motion on behalf of all defendants. The briefs and exhibits associated with this motion are voluminous. The motion presents close and disturbing questions on the issues of absolute and qualified immunity of state officials involved in child protection and child welfare matters. This Order resolves the pending summary judgment motion as to all remaining defendants.

## II. SUMMARY OF PROCEEDINGS

The Court held pretrial hearings on October 11, 13, and 24, 1988 relating to the pending motion for summary judgment and other pretrial matters.

At the hearing held on October 11, 1988, the Court granted summary judgment on behalf of defendant Conley Tunnell, Assistant Director for the Division of Children and Youth Services, and further dismissed plaintiffs' claim for injunctive relief against DHS. *See* Order of October 11, 1988. Plaintiffs had previously dismissed defendant Lissa Vernon. As a result, the only remaining defendants are five DHS employees: (1) Mary Asbury, District Supervisor for the Division of Children and Youth

Services; (2) Michael Swepston, County/District Program Supervisor for the Division of Children and Youth Services' Child Welfare Unit in Oklahoma County; (3) Pam Padley, DHS Assistant General Counsel; (4) Barbara Sieck, a Social Services Supervisor for the Division of Children and Youth Services' Child Welfare Unit, and (5) Benita Levingston, a Social Worker in the Division of Children and Youth Services' Child Welfare Unit.

On October 11, 1988, Ted Sherwood, guardian *ad litem* for the fifteen children plaintiffs who are not the natural or adopted children of the Snells, announced settlement on behalf of thirteen of those plaintiffs. As a result, the only remaining plaintiffs in this case are Clark and Sharon Snell, their five adopted children, and the two children formerly represented by Mr. Sherwood.[2] None of the children removed from the Snell home on August 26, 1987 remain as plaintiffs.

The plaintiffs allege that defendants individually deprived them of constitutional rights guaranteed by the fourth, fifth and fourteenth amendments, and conspired to do so. Defendants deny the allegations of the plaintiffs, asserting that their conduct was in good faith, and raise the affirmative defenses of absolute and qualified immunity. Although findings and conclusions were announced by the Court at the October 11, October 13, and October 24, 1988 hearings on a number of pretrial matters, some further history of the proceedings will help place the matter in context for purposes of this Order.

In reviewing the motion for summary judgment, the Court was mindful that caution is advised in pretrial dispositions of conspiracy allegations in civil rights actions. *See Hammond v. Bales*, 843 F.2d 1320, 1323 (10th Cir.1988) (citing *Fisher v.*

*Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980)). However, to survive a motion for summary judgment on a conspiracy claim, plaintiffs must show the existence of a conspiratorial agreement. *Hammond v. Bales*, 843 F.2d at 1324. In sifting through the briefs and exhibits, the Court experienced great difficulty discerning plaintiffs' conspiracy theory.

Accordingly, the Court issued an order on October 11, 1988, which cautioned plaintiffs that it would not be sufficient to merely identify several possible suspects in the alleged deprivation of plaintiffs' civil rights, informed plaintiffs that it expected and required evidence proving the existence of the alleged *agreement* to violate plaintiffs' civil rights, and required plaintiffs to file a Supplemental Response Clarifying Plaintiffs' Conspiracy Theory, which was to provide the following:

1. Identify each member of the alleged conspiracy, including both parties and non-parties.

2. Specify the duration of the alleged conspiracy, giving the date it began and the date it ended.

3. As to each defendant who is a member of the alleged conspiracy, state when the defendant joined the alleged conspiracy and the words or conduct through which the defendant joined the alleged conspiracy.

4. As to each defendant who is a member of the alleged conspiracy, itemize the independent evidence (i.e. each defendant's own words or conduct) which establishes the defendant's participation in the alleged conspiracy, including evidentiary citations which establish that such evidence is admissible.

Order, Oct. 11, 1988.[3]

Plaintiffs filed a document attempting to comply with this Order on October 18,

---

2. With the consent of all parties, the Court permitted Mr. Sherwood to withdraw from representing these two children because they are in the process of being adopted by the Snells. These two children are now represented by counsel for the Snells.

3. At the outset of this case, plaintiffs filed a Section 1985 conspiracy count against the defendants, claiming their actions were racially

motivated. *See* Plaintiffs' Amended Complaint at 11, ¶ 17. The claim was apparently based on the fact that all seven of the children removed from the Snell home on August 26, 1987, were Black. Ted Sherwood, who was appointed by the Court after the filing of the Complaint as guardian *ad litem* for these children, subsequently moved to dismiss the Section 1985 action with prejudice. Sherwood, after careful

1988.[4] Defendants filed a response on October 21, 1988. The final hearing on the summary judgment motion was held on Monday, October 24, 1988. For the reasons set forth below, defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

### III. SUMMARY JUDGMENT STANDARDS

#### A. *Summary Judgment in General*

The facts presented to the court upon a motion for summary judgment must be construed in a light most favorable to the nonmoving party. *Board of Education v. Pico*, 457 U.S. 853, 864, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). If there can be but one reasonable conclusion as to the material facts, summary judgment is appropriate. Only genuine disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Finally, the movant must show entitlement to judgment as a matter of law. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985); Fed.R.Civ.P. 56(c).

Although the Court must view the facts and inferences to be drawn from the record in the light most favorable to the nonmoving party, even under this standard there are cases where the evidence is so weak that the case does not raise a genuine issue of fact. *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988). As stated by the Supreme Court, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

The Supreme Court recently emphasized that, before granting summary judgment, the "requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510 (emphasis in original). A dispute is "genuine" if a reasonable jury could return a verdict for the nonmoving party. *Id.* The Court stated that the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512. "The mere existence of a scintilla of evidence in support of the [party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [party]." *Id.* at 252, 106 S.Ct. at 2512.

#### B. *Qualified Immunity*

In the recent case of *Coen v. Runner*, 854 F.2d 374 (10th Cir.1988), the Tenth Circuit articulated the standard to be used in determining whether to grant summary judgment based on qualified immunity. In *Coen*, our circuit stated:

Qualified immunity is an affirmative defense that protects government officials from personal liability unless their actions violate clearly established law of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S.

---

analysis of the case, candidly acknowledged the "weakness" of this claim at the time of the requested dismissal. His co-counsel, Allan De-Vore, made a similar acknowledgement at oral argument on October 11, 1988. In truth, the charge was baseless. Even a cursory review of the summary judgment filings reveals the Section 1985 action to be totally without merit. Nevertheless, this scurrilous allegation was trumpeted in the press by plaintiffs, and it is this allegation which has fueled much of the emotionally explosive atmosphere which now surrounds the case.

4. Plaintiffs submission on October 18, 1988 did not comply with this Court's Order of October 11, 1988 in several respects. In direct violation of the Order, plaintiffs cited to numerous evidentiary materials *not* before the Court, failed to specify the independent evidence pertaining to each defendant, and failed to provide evidentiary citations to many items of questionable admissibility. *See* Order dated October 21, 1988, Transcript of October 24, 1988 hearing, and Defendants' Objection to Plaintiffs' Application to Supplement filed October 20, 1988.

800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Once the defense has been raised and the plaintiffs have met their burden of identifying both the clearly established law that the government official is alleged to have violated and the conduct that violated that law, the defendant must demonstrate that no material issues of fact remain as to whether his or her actions were objectively reasonable in light of the law and the information he or she possessed at the time. *Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 646 (10th Cir.1988). A defendant who makes such a showing of objective reasonableness is entitled to summary judgment unless the plaintiff can demonstrate that there are factual disputes relevant to the defendant's claim to immunity. *DeVargas v. Mason & Hanger–Silas Co.,* 844 F.2d 714, 719 (10th Cir.1988) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)).

*Coen v. Runner,* 854 F.2d at 377.

## IV. FACTUAL ANALYSIS

■ The undisputed facts in this case were not easily ascertained. Aside from the fact that counsel have discovered few areas of common ground, plaintiffs' response to defendants' motion for summary judgment, filed July 29, 1988, was of little help in sorting out the facts.

Local Rule 14(B) specifically sets forth the requirements for responding to motions for summary judgment in this district. One purpose of Rule 14(B) is to assist the Court in identifying the undisputed facts in complicated cases such as this. Rule 14(B) provides, in pertinent part:

> The brief in opposition to a motion for summary judgment (or partial summary judgment) shall begin with a section which contains a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, shall state the number of the movant's fact that is disputed. All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party.

W.D.Okla.R. 14(B).

Plaintiffs' compliance with Local Rule 14(B) was mediocre at best. Rather than specifically controverting defendants' alleged undisputed facts, plaintiffs responded in shotgun fashion with a series of questions. For example, under plaintiffs' statement of "Material Issues of Fact About Which a Genuine Controversy Exists", plaintiffs' first "material fact", and citations to evidentiary material in support thereof, reads as follows:

> 1. Whether defendants had a good faith reasonable belief in the lawfulness of their conduct.
>
> (Federal statute PL 96–272 and Oklahoma Statutes, Exhibits "G" and "H"; DHS procedures, Exhibit "I" §§ 621, 622.1, 622.2, 622.41; Depositions of Rebecca McNeese, Exhibit "J"; Leslie Treece, Exhibit "U" and Testimony of Detective Einhorn, Exhibit "O", all disputing defendants Fact # 1) (Exhibits are included in the Appendix to this brief).

Plaintiffs' Revised Brief at 1.

Plaintiffs' Exhibit "O", cited above, is nine pages. Plaintiffs' Exhibit "J" is more than thirty pages. Plaintiffs' broad factual questions supported by general citations to lengthy evidentiary attachments fall well short of the particularity contemplated by Local Rule 14(B). In effect, plaintiffs have told the Court: "Here judge, you read all these materials and figure out the undisputed facts yourself." As a result, plaintiffs' various summary judgment filings have delayed, rather than expedited, the issuance of this Order, and have not aided the Court in evaluating the facts in this case.[5]

---

5. Plaintiffs' conspiracy theory was even more difficult to discern from the initial summary judgment filings. Plaintiffs' briefs repeatedly refer to "they" and "defendants" without any specificity. As a result, the Court ordered plaintiffs to file a supplemental response clarifying

While the Court could have deemed plaintiffs' entire summary judgment response a procedural default under Rule 14(B), the important and sensitive issues raised by this civil rights action have caused the Court to instead undertake its own analysis of the undisputed facts.

After carefully examining the evidentiary submissions of the parties at the summary judgment stage, the following is an analysis of the conduct of each of the remaining five defendants, based on the undisputed facts, and on the disputed facts when viewed in the light most favorable to the plaintiffs.

1. Clark and Sharon Snell were known to DHS long before the events occurred which led to plaintiffs' cause of action in this case. Plaintiffs' Ex. "P", Affidavit of Clark and Sharon Snell at 1–3; Plaintiffs' Ex. "1", Deposition of Mary Asbury at 140.

2. The Snells have complained to DHS and other governmental agencies on several occasions regarding DHS social workers. Plaintiffs' Ex. "P", Affidavit of Clark and Sharon Snell at 3–4.

3. In February 1987, Sunbeam Family Services conducted an informal study of the Snell home. Its report concluded by stating that "we were very impressed with the Snell home and their ability to meet the needs of the children presently in their care." Plaintiffs' Ex. "Q", Sunbeam Family Services Report.

4. On April 1, 1987, Prins Anderson and Judy Collins, the Administrator, and Assistant Administrator of the DHS Licensing Unit, respectively, visited the Snell home. They determined that the Snells were not in violation of the Child Care Facilities Licensing Act. Plaintiffs' Ex. "S", Report of Prins Anderson.

5. On July 13, 1987, a referral concerning the Snell home was received by DHS social worker, David McLain. Plaintiffs'

Ex. "U", Child Abuse/Neglect Referral. The referral reported "environmental [neglect] and lack of supervision." *Id.*

6. McLain visited the Snell home in regard to this referral on July 13, 1987. Plaintiffs' Ex. "D", Deposition of Sharon Snell at 32–33.

7. Defendant Mary Asbury learned of the referral received by David McLain regarding the Snell home, on the day it was received, July 13, 1987. Plaintiffs' Ex. "1", Deposition of Asbury at 142, 145.

8. On July 13, 1987, or shortly thereafter, McLain filed a CWS 14–A report with the District Attorney's Office concerning the referral. Plaintiffs' Ex. "V", Report to District Attorney, July 13, 1987.

9. On July 14, 1987 the day following McLain's visit to the Snell home, defendant Asbury spoke with McLain about his CWS 14–A report. That report indicated the Snells would not identify the children, but the Snell home was nice and comfortable. Plaintiffs' Ex. "1", Deposition of Asbury at 149.

10. On or about July 14, 1987, Asbury told McLain that he should characterize his investigation as "uncertain" and close the case. Plaintiffs' Ex. "1", Deposition of Asbury at 150.

11. The CWS 14–A report was filed with the District Attorney's Office and reviewed by Assistant District Attorney Rebecca McNeese sometime during July, 1987. Plaintiffs' Ex. "J", Deposition of McNeese at 35. As the CWS 14–A report was designated as "for information only" McNeese threw it away. *Id.* at 35. McNeese could not remember whether the report was a copy or the original, but normally such a report would be an original. *Id.* at 25, 35.

12. At McNeese's deposition on June 22, 1988, McNeese testified that the CWS 14–A report produced to plaintiffs during

plaintiffs' conspiracy theory. Order, Oct. 11, 1988. As an additional example of the poor work product submitted to the Court by plaintiffs, plaintiffs repeatedly referred in their summary judgment response to the affidavit of news reporter Marty Griffin in an effort to defeat defendant Conley Tunnell's motion for summa-

ry judgment. After hours of futilely combing the files in the Clerk's Office for this evidence, the Court learned at oral argument on October 11, 1988 that there was no such affidavit. This, among other things, precipitated Tunnell's dismissal. Order, Oct. 11, 1988.

discovery (and included as Plaintiffs' Ex. "V") is not the report she received in July of 1987. *Id.* at 40–41. McNeese testified that the CWS 14–A report she reviewed in July 1987 contained allegations of child abuse, child pornography and child prostitution. *Id.* at 37–38. McNeese did not recall anything about licensing violations being included in the report. *Id.* at 38. These are both inconsistent with the CWS 14–A report produced by DHS which is plaintiffs' Ex. "V". Additionally, McNeese noted other variations between the report she reviewed in July 1987 and the report which was produced by plaintiffs during discovery and which is plaintiffs' Ex. "V". The CWS 14–A report which is plaintiffs' Ex. "V" is dated July 23, 1987 and was signed not only by David McLain but also by Mike Swepston.[6]

13. On or about July 20, 1988, Lissa Vernon, DHS Supervisor of Child Welfare Field Services for the Division of Children and Youth Services, called Asbury and informed her that Clark Snell had made complaints about Asbury to DHS. Plaintiffs' Supp.Ex. "A", Deposition of Vernon at 25.

14. Sometime during July, 1987, defendant Asbury prepared a memorandum to George Miller, Acting Deputy Director of Programs, dated July 23, 1987. The memorandum contained, among other things, the following information: (1) DHS had received complaints from parents and relatives that the Snells would not give up children and may have coerced parents' signatures by telling the parents they would be referred to child welfare and would never get their children back; (2) the Snells had been complaining to DHS; (3) DHS had received reports that the children at the Snell home were unsupervised and poorly cared for, and; (4) DHS had received phone calls from the Warr Acres police informing them that the Snells were known drug dealers. Plaintiffs' Ex. "I1", Memorandum from Asbury to George Miller, July 23, 1987.

15. In late July or early August, 1987, DHS received three referrals concerning the Snells. Defendants' Ex. "1", Affidavit of Asbury at 1–2. One referral reported that seventeen (17) to twenty (20) children resided at the Snell home with inadequate supervision. Plaintiffs' Ex. "Z". The second referral concerned a mentally retarded boy, G.H., who had resided at the Snell home and had alleged that he had been kicked, and struck on the ears by Mr. Snell. Plaintiffs' Ex. "B1". The third referral asserted that the Snell home was dirty and the children were unsupervised. Plaintiffs' Ex. "A1".

16. Sometime in late July or early August, 1987, Asbury agreed with Vernon that DHS would not do anything further concerning the Snells until "we had the meeting" with state and regional DHS officials. Plaintiffs' Ex. "2", Deposition of Asbury at 176–77.

17. On August 10, 1987, Asbury assigned the three referrals on the Snells to defendant Barbara Sieck. Sieck later assigned them to defendant Benita Levingston. Plaintiffs' Ex. "4", Deposition of Asbury at 227; Defendants' Ex. "1" Affidavit of Asbury at 3. Asbury asked Sieck to delay action on the referrals until Sieck received further direction. Defendants' Ex. "1", Affidavit of Asbury at 3. The three referrals, contrary to DHS policy, were not assigned a priority. *See* Plaintiffs' Supp.Ex. "F", Deposition of Sieck at 285–88; Plaintiffs' Ex. "2", Deposition of Asbury at 168–69, 176. Nor was the investigation of the referrals begun immediately as would be required by DHS policy had the referrals been determined to contain allegations which would place the children in imminent harm. Plaintiffs' Supp.Ex. "F", Deposition of Sieck at 289, 293.

18. On August 12, 1987, defendant Padley, defendant Asbury, Lissa Vernon, DHS Supervisor of Child Welfare Field Services, Judy Collins, Assistant Administrator of the DHS Licensing Unit, and Prins Anderson, Administrator of the DHS Li-

---

**6.** Plaintiffs allege that in November 1987 DHS sent another "original" copy of a CWS 14–A report.

censing Unit, met to discuss the Snell situation. Plaintiffs' Supp.Ex. "D", Deposition of Asbury at 207. Asbury had prepared a list of things to discuss at the meeting. The following matters were discussed at the meeting: (1) DHS had received complaints that there were large numbers of children coming in and out of the Snell home (*id.* at 205–207); (2) Jesus House [7] clients were told by the Snells that if they did not place their children with the Snells, the Snells would call child welfare (*id.* at 208); (3) Clark Snell had a fraud conviction but denied having a criminal record in three home adoptive studies (*id.*); (4) Asbury believed that it was not possible that Clark Snell could be earning what he claimed from appliance repair (*id.* at 211); (5) Clark Snell's business phone number was listed only in the white pages of the phone directory (*id.* at 212); (6) Asbury believed that the organization DARE which was providing the Snells with rent money did not exist (this belief was erroneous and Asbury conducted only a limited investigation into this) (*id.* at 217–219); (7) the Snells would have parents sign a notarized statement giving the Snells temporary custody of the children, and Asbury believed it was doubtful that legal guardianship ever occurred (*id.* at 221, 222); and (8) Clark Snell had refused to cooperate with McLain as to identifying the children in the Snell home. *Id.* at 223.

19. At the meeting between defendant Padley, defendant Asbury, Vernon, Collins and Anderson on August 12, 1987 the decision was made to refer the matter for police investigation and for Padley to contact Assistant District Attorney Rebecca McNeese for assistance. Plaintiffs' Supp.Ex. "D", Deposition of Asbury at 224.

20. The first contact that Detective J.M. Einhorn had concerning the Snells was with defendant Benita Levingston. Plaintiffs' Supp.Ex. "G", Deposition of Einhorn at 49.

21. On or about August 14, 1987, Detective Einhorn went to the DHS building at the request of Levingston who had asked him to speak with defendants Swepston and Asbury. Plaintiffs' Supp.Ex. "G", Deposition of Einhorn at 49. When Einhorn arrived defendants Asbury, Swepston and Levingston were there. *Id.* at 50. A meeting ensued.

22. During the August 14 meeting referenced above, Swepston and Asbury related to Einhorn the following: (1) that somebody had called DHS and said that there were lots of children living in the Snell home and that the children were coming in and out at all hours of the night; (2) that there were also lots of adults coming in and out of the house at all hours of the night; and (3) that Clark Snell had failed to indicate in home adoptive studies that he had a previous criminal conviction. Plaintiffs' Supp.Ex. "G", Deposition of Einhorn at 50–56. During this meeting Swepston, Asbury and Einhorn were at first concerned about licensing. The conversation then turned to "everything else" that might happen with a large number of people coming in and out of the house. *Id.* at 54–56. This appears to be the genesis of the pornography and prostitution suspicions.

23. At the August 14 meeting, referenced above, Einhorn told defendants Swepston and Asbury that a police investigation was warranted and told them not to do anything until they heard further from him. Plaintiffs' Ex. "6", Deposition of Asbury at 242.

24. On or about August 17, 1987, defendants Asbury and Levingston met with Special Agent Treece. Treece related to them that she needed to interview Clark Snell in connection with a complaint initiated by Snell to a Las Vegas FBI agent about a man who had passed through Jesus House who allegedly was prostituting his sons. Later Snell would deny that he ever met this man. Asbury and Levingston clearly understood that there was no investigation of allegations that Snell was involved in child pornography or prostitution. Plaintiffs' Ex. "6", Deposition of Asbury at 243. Treece reviewed the information

---

7. Jesus House is a shelter for the homeless located in Oklahoma City, Oklahoma, where Clark and Sharon Snell formerly worked as volunteers.

which DHS had concerning the Snells. Plaintiffs' Ex. "6", Deposition of Asbury at 243. Treece never suggested to any DHS employee that the Snells were under investigation for pornography or prostitution.

25. Sometime before August 26, 1987 defendant Levingston spoke with FBI Special Agent Leslie Treece. Levingston related to Treece that she was receiving complaints from the neighbors of the Snells about child pornography and prostitution. This was the first Treece had heard of the possibility of child pornography or prostitution going on in the Snell home. Plaintiffs' Ex. "W", Deposition of Treece at 17–18. Levingston spoke with Agent Treece on several occasions. Each time they spoke it was about the complaints DHS had received concerning the Snells. *Id.* at 20. Levingston, in her Affidavit, has denied ever asserting that the Snells have engaged in child prostitution or child pornography. Defendants' Ex. "6", Affidavit of Levingston at 4.

26. On August 18 or 19, 1987, defendant Padley called Assistant District Attorney Rebecca McNeese. Padley told McNeese that she was going to ask McNeese for a favor concerning the Snells. McNeese cutoff the conversation at this point and it went no further. Plaintiffs' Ex. "J", Deposition of McNeese at 29.

27. On or about August 19, 1987, defendant Mike Swepston had a conversation with Clark Snell. Snell had been attempting to set up a meeting with DHS officials at the state office. Plaintiffs' Ex. "E1", Deposition of Clark Snell at 12. During the conversation Swepston began talking about G.H., a mentally retarded boy who was the source of one of the Snell referrals. According to Snell, Swepston said: "You know anything could happen with that." Snell replied: "You know, we haven't done anything wrong." Swepston replied: "You don't have to do anything wrong out here. All we have to do is shuffle some papers around, and we can make anything fit." *Id.* at 14.

28. Early in the day on August 19, 1987 defendant Asbury instructed defendant Levingston to go to the police station to talk with the police captain regarding a statute which provided that it was a misdemeanor to have guardianships of more than five unrelated people, and regarding the investigation concerning the Snells. Plaintiffs' Supp.Ex. "K", Deposition of Levingston at 53.

29. On August 19, 1987 defendant Levingston went to the police station and spoke personally with Captain Griffith. Levingston told Captain Griffith of the allegations of abuse and neglect against the Snells and of the statute relating to guardianship. Plaintiffs' Supp.Ex. "K", Deposition of Levingston at 56–57. Levingston told Griffith that she thought the statute meant that the Snell children should be removed. *Id.* at 58.

30. Later in the day on August 19, 1987 defendant Levingston, Hilde Lillegaard, of the DHS Licensing Unit, and defendant Sieck took the guardianship statute to the police station. Plaintiffs' Supp.Ex. "K", Deposition of Levingston at 53.

31. Following the meeting with Asbury on August 19, 1987, Lillegaard, Sieck and Levingston rode together to the police station. Plaintiffs' Ex. "C1", Deposition of Sieck at 145. When Levingston, Sieck and Lillegaard arrived at the police station, Griffith was not there so they talked to a sergeant on duty. Defendant Levingston told the sergeant that she had talked to Captain Griffith earlier in the day, and she was instructed to bring the guardianship statute, and the sergeant would accompany them to the Snells' home. Plaintiffs' Supp.Ex. "K", Deposition of Levingston at 55. The sergeant, however, said that he would need a court order to pick up the children from the Snell home. *Id.* at 59.

32. On August 19, 1987, after Sieck, Levingston and Lillegaard had returned from the police station, Sieck spoke with Asbury. Sieck told Asbury that the shift had changed at the police station and the sergeant would not send anyone to the Snell home without a court order. Plaintiffs' Ex. "7", Deposition of Asbury at 264.

33. Defendant Asbury's next contact with Sieck or Levingston was around 6:30 or 7:30 p.m. on August 19, 1987. Asbury

received a call from defendant Sieck (apparently the call was placed from the home of Snells' neighbor). Sieck told Asbury that they had encountered difficulty and asked for Judge Brown's telephone number. Plaintiffs' Ex. "7", Deposition of Asbury at 264–65.

34. Sometime around that time, on August 19, 1987, defendant Asbury unsuccessfully attempted to call Judge Brown. Asbury also called and spoke briefly with Judge Major Wilson regarding the Snell matter. Judge Wilson told Asbury that he would rather talk to them in person regarding a pick-up order. Plaintiffs' Ex. "7", Deposition of Asbury at 264–66.

35. Also, on the evening of August 19, 1987, as noted above, Lillegaard, Sieck and Levingston visited the home of neighbors of the Snells. Defendant Levingston then called Judge Brown and talked to him for five to ten minutes. Levingston related to the Judge: (1) the existence of the referrals DHS had received about the Snells, (2) the existence of the guardianship statute which provided that it was a misdemeanor to have guardianship of more than five unrelated children and, (3) her fear that the Snells were moving. Plaintiffs' Supp.Ex. "K", Deposition of Levingston at 77–79. Judge Brown told Levingston he would issue a pick-up order if they thought an emergency existed. Id. at 79–85. Defendant Levingston kept the Judge on hold for a moment while she consulted with defendant Sieck. Levingston told Sieck that Judge Brown had asked if there was an emergency. Defendant Sieck replied to Levingston that there was an emergency. However, it does not appear that Sieck's reply was communicated to Judge Brown. Id. at 80–81. Defendant Levingston told Judge Brown she would call him back if they needed a pick-up order. Id. at 83; see also Plaintiffs' Supp.Ex. "J", Deposition of Brown at 21.

36. Levingston, Lillegaard and Sieck then decided to call Pam Padley. Plaintiffs' Supp.Ex. "K", Deposition of Levingston at 84. Defendant Levingston called defendant Padley and told her what they had done, and that the Judge was not familiar with the guardianship statute. Levingston asked Padley to interpret the statute and Padley replied that she did not understand the statute to authorize removal of the children. Id. at 84–85. Levingston then told Lillegaard and Sieck what Padley said. Id.

37. Defendant Asbury met with Levingston and Sieck back at the DHS office on the evening of August 19, 1987 after they had been to the home of Snells' neighbor. Plaintiffs' Ex. "7", Deposition of Asbury at 266.

38. On or about August 20, 1987, Assistant District Attorney Sullins told Assistant District Attorney McNeese that he had been approached by defendant Sieck concerning picking up 19 or 20 children from a home. Sieck had shown Sullins the guardianship statute. Plaintiffs' Exhibit "J", Deposition of McNeese at 28.

39. On August 20, 1987 defendant Asbury spoke with defendant Padley. They discussed Padley's conversation with defendants Sieck and Levingston the previous night. Asbury and Padley tentatively planned to get together and discuss the issues in the Snell case. Plaintiffs' Ex. "7", Deposition of Asbury at 276.

40. On August 21, 1987 Asbury met with Padley. The two discussed what might constitute a legal emergency which would justify picking up children. Plaintiffs' Ex. "7", Deposition of Asbury at 277.

41. On August 24, 1987, defendant Asbury met with defendant Levingston. Asbury told Levingston that she was concerned that the police did not appear to be doing anything. Plaintiffs' Ex. "7", Deposition of Asbury at 279.

42. On, or just prior to, August 24, 1987, Asbury gave Levingston a statute which contained the language "upon conviction"[8] and told Levingston it was rele-

---

**8.** The statute which uses this language is apparently 10 Okla.Stat. § 410, under the Oklahoma Child Care Facilities Licensing Act, which provides:

Any person or agent, representative, or officer of any child care facility who violates any of the provisions of this act shall, upon conviction, be deemed guilty of a misdemeanor and punished

vant to the Snell case. Plaintiffs' Supp.Ex. "K", Deposition of Levingston at 107, 110, 111.

43. On, or just prior to, August 24, 1987, defendant Levingston called Einhorn and asked him to call Assistant District Attorney Deason and to ask Deason if the licensing statute that used the language "upon conviction" was relevant to the Snell case. Einhorn suggested to Levingston that she go to the District Attorney's Office and talk with an Assistant District Attorney named Mimi (Mary Smith) and show her the licensing statute. Plaintiffs' Supp.Ex. "K", Deposition of Levingston at 108. Levingston went to the District Attorney's Office and met the court liaison for DHS, Kathy O'Malley. *Id.* at 108, 109. Levingston and O'Malley went to talk to Assistant District Attorney Smith. When O'Malley became aware that Levingston was there about the Snells she said that they should not discuss the Snell situation because Assistant District Attorney McNeese would get mad. *Id.* at 108, 109.

44. Defendant Levingston left Smith's office and contacted Detective Einhorn. She told him what happened at the District Attorney's Office. Plaintiffs' Supp.Ex. "K", Deposition of Levingston at 111.

45. Sometime during this period of time, on or about August 24, 1987, defendant Levingston asked defendants Swepston and Sieck for permission to talk to Judge Brown and ask him for an interpretation of the licensing statute which used the language "upon conviction". Defendants Swepston and Sieck agreed that this was fine. Plaintiffs' Supp.Ex. "K", Deposition of Levingston at 112–113.

46. On August 24, 1987 Levingston went to Judge Brown's office and asked him for an interpretation of the statute that used the language "upon conviction". Plaintiffs' Supp.Ex. "K" Deposition of Levingston at 107, 114–15. Judge Brown's "interpretation was that the 'upon conviction' did mean that it was a misdemeanor and that the parents could be arrested."

*Id.* at 114–115. By this time it was late and Levingston went home for the day. *Id.* at 115.

47. On August 26, 1987 between 8:00 and 8:30 a.m. defendant Levingston called Detective Einhorn and told him the interpretation Judge Brown had given the statute. Plaintiffs' Supp.Ex. "K", Deposition of Levingston at 117–118. Levingston suggested to Einhorn that he call Judge Brown to make sure Einhorn "understood the same thing that [Levingston] had understood." *Id.*

48. On August 26, 1987 between 9:00 and 9:30 a.m. Einhorn called defendant Levingston back, and said that Judge Brown was going to sign an order to pick up the children at the Snell home. Einhorn did not mention anything about child pornography or child prostitution during this conversation with Levingston. Plaintiffs' Supp.Ex. "K", Deposition of Levingston at 117–119.

49. Later that day on August 26, 1987, defendant Padley received a phone call from Einhorn requesting she file an application in the Juvenile Division of the District Court. Einhorn told her he had talked with Judge Brown and Judge Brown said that he would issue an order to the police, but Brown wanted an application from DHS. Einhorn told Padley "when all this came out, that the department [DHS] would look real bad." Defendant Padley told Einhorn to talk to the District Attorney and she would do some checking internally. Plaintiffs' Ex. "C", Deposition of Padley at 157–58.

50. Following her conversation with Einhorn, still on August 26, 1987, Padley had phone conversations with people in child welfare in which she discussed the status of the Snell case. Plaintiffs' Ex. "C", Deposition of Padley at 158–59.

51. Sometime during the period these conversations were taking place on August 26, 1987, Padley received a telephone message that Judge Brown would like to speak

in accordance with the provisions of 21 O.S. 1961, § 10. Whenever any agent, representative, or officer of any child care facility shall be convicted under authority of this act, such conviction shall be sufficient grounds for the revocation of the license of said licensee.

with her. Plaintiffs' Ex. "C", Deposition of Padley at 159. Padley returned the message and spoke with an employee in Judge Brown's office. The employee explained that Judge Brown was on the bench and would like to set an appointment. *Id.* at 160.

52. On August 26, 1987 defendant Padley spoke with Einhorn again and was told that he had spoken with Assistant District Attorney Mary Smith. According to Padley, Einhorn said that Mary Smith said that if the issue was in reference to the Snells that it was a DHS problem and that the District Attorney's Office was not going to get involved. Plaintiffs Ex. "C", Deposition of Padley at 159. During this conversation, Einhorn and Padley discussed Einhorn's contact with the Assistant District Attorney and Judge Brown. Padley told Einhorn that she was aware DHS had child abuse allegations concerning the Snell household involving both neglect and abuse. Padley said she also knew the FBI had contacted DHS and indicated its interest in interviewing Mr. Snell in connection with a child prostitution and pornography investigation of another person, but that there were no allegations that the Snells were involved in child prostitution, pornography or trafficking of children. *Id.* at 160. Padley said she would see whether DHS would file an application. *Id.* at 161.

53. On August 26, 1987 Einhorn told Judge Brown that the reason he went to DHS was because defendants Asbury and Swepston were concerned about the number of kids in the Snell home, and complaints from neighbors concerning people going in and out of the home all day long. Plaintiffs' Supp.Ex. "G", Deposition of Einhorn at 42. Einhorn told Judge Brown that Levingston had told him the Snells would not cooperate with a DHS worker who went to their home. *Id.* at 42. Einhorn also related to Judge Brown that Mr. Snell had a criminal record but had not indicated that fact on home adoptive studies. *Id.* at 41–42. Einhorn also told Judge Brown that Special Agent Treece had told him that she was investigating "a white male who was a known prostitute in regards to the Snells...." *Id.* at 39–40. All of Einhorn's

information regarding the allegations of child pornography which he related to Judge Brown came from defendants Asbury, Levingston and Swepston. Plaintiffs' Ex. "O", Testimony of Einhorn Transcript of Proceedings before Judge Brown on August 27, 28 and 31, 1987 at 68, 71.

54. Sometime during the day on August 26, 1987 defendant Padley spoke with Judy Collins, an Assistant DHS Administrator. Padley related to Collins that she had information from a police officer which indicated there may be abuse at the Snell home. Plaintiffs' Ex. "N", Deposition of Collins at 48. Padley and Collins also talked about licensing and the need to determine the identities of the children in the Snell home. *Id.* at 49. During this conversation Collins related to Padley that if it was a licensing issue then an additional meeting should be set up with the Snells. *Id.* at 50, 80. Collins further related that the Snells had been cooperative. *Id.*

55. On August 26, 1987, following her second conversation with Einhorn, Padley spoke with Judge Brown. Plaintiffs' Ex. "C", Deposition of Padley at 165. Judge Brown wanted her to file an application so he could enter an order to assist DHS in completing its investigation of the Snells. *Id.* at 169. Padley told him it would be discussed within the Department. *Id.*

56. Later on August 26, 1987, Padley contacted defendants Levingston, Sieck, Swepston and an employee in licensing. Padley then prepared the Application. Plaintiffs' Ex. "C", Deposition of Padley at 187. Padley had no idea whether the allegations contained in the Application were true or false. *Id.* at 273. The Application filed by Padley was the only one of this type Padley knew of anyone in DHS preparing. *Id.* at 169–70.

57. The Application prepared by Padley asserted among other allegations, that DHS had recieved allegations of child prostitution and child pornography in the Snells' home. Defendants' Ex. "4", Application filed August 26, 1987, *In the Matter of Child Abuse and Licensing Investigations of the Clark and Sharon Snell*

*Home by the Oklahoma Department of Human Services* at ¶ 1.

58. On August 26, 1987 Padley went to Judge Brown's chambers and presented him with the Application. Padley indicated to Judge Brown that DHS was having problems completing the investigation. Plaintiffs' Ex. "C", Deposition of Padley at 187–88. The judge dictated the Order while Padley waited in his office. *Id.* at 188, 275. The pornography and prostitution allegations were the determinative factor in Judge Brown's decision to issue an order. According to Brown, it was the pornography/prostitution allegations which later led him to state: "I was concerned that I had been sort of sucked into a situation where—for lack of better terminology—into issuing an order that had a lot of miscommunication." Plaintiffs' Ex. "D", Deposition of Judge Brown at 47–48.

59. Between 3:50 and 4:30 p.m. on August 26, 1987, Padley arrived at Levingston's office with the Order signed by Judge Brown. Defendants Levingston, Sieck, Padley and Swepston reviewed the Order. Defendants' Ex. "6", Affidavit of Levingston at 2.

60. On August 26, 1987 defendant Levingston called Special Agent Treece and invited her to go to the Snells that evening. Levingston told Treece they were going to request documentation of the children and pick up those children who had none. Plaintiffs' Ex. "W", Deposition of Treece at 24. Treece advised Levingston that there were no apparent federal violations and declined the invitation. *Id.* at 25.

61. At approximately 5:00 p.m. on August 26, 1987 defendant Sieck, defendant Levingston, and Lillegaard arrived at the police station and presented Sergeant George Johnson with the Order signed by Judge Brown. Plaintiffs' Ex. "E", Affidavit of Sergeant Johnson at 1–2.

62. Sergeant Johnson, accompanied by officers Thomas Picchione and Rodney Hill and by defendant Sieck, defendant Levingston and Lillegaard arrived at the Snell residence around 5:30 or 6:00 p.m. on August 26. When they entered the Snell home Sergeant Johnson observed that the house was generally clean and noticed no obvious signs of child abuse or neglect. *Id.* at 2.

63. When Sharon Snell arrived home on August 26, 1987 defendant Levingston, defendant Sieck, Lillegaard and the three police officers were already at the Snell home. Plaintiffs' Ex. "D", Deposition of Sharon Snell at 8, 13–14.

64. When Sharon Snell entered her home on August 26, 1987, defendant Levingston told Mrs. Snell that she wanted to talk to her. Plaintiffs' Ex. "D", Deposition of Sharon Snell at 9.

65. Defendant Levingston handed Mrs. Snell a list of allegations regarding the children including "non-supervision of bicycle riding and having been left at the neighbors for long periods of time." Plaintiffs' Ex. "D", Deposition of Sharon Snell at 14. Neither the DHS officials nor the police officers mentioned the child pornography or prostitution allegations. The Snells did not learn of the allegations of child prostitution and pornography until the date of the hearing on August 27, 1987. *Id.* at 54–55.

66. Next Mrs. Snell went to the master bedroom and began making phone calls. Plaintiffs' Ex. "D", Deposition of Sharon Snell at 9–10. Mrs. Snell called a sympathetic DHS social worker, Eloise Harris, and was speaking with her on the phone. Defendant Levingston took the phone from Mrs. Snell and slammed it down. *Id.* at 10–11. Levingston told Mrs. Snell she could talk to Eloise at a later date. *Id.* Levingston said to Mrs. Snell, "If you don't talk to me, I will get the police in here and they will make you talk to me." *Id.*

67. Defendant Levingston told Mrs. Snell that she needed to produce paper work and if she did not cooperate, the police would force her to cooperate. Plaintiffs' Ex. "D", Deposition of Sharon Snell at 15.

68. Mrs. Snell went to the living room and retrieved the files the Snells had regarding the children. Plaintiffs' Ex. "D", Deposition of Sharon Snell at 16. Mrs. Snell began to produce the first document

when defendant Sieck said: "That is not a legal document because it [is] rubber stamped." *Id.* Sieck, in the presence of Levingston, then said "[t]o load up the kids, this lady does not have any legal documents on these kids." *Id.* at 16–17.

69. Following this episode Mrs. Snell went to the bedroom and called her husband, and made several other phone calls. She then returned to the living room. Plaintiffs' Ex. "D", Deposition of Sharon Snell at 19–22. By this time the DHS employees and police officers had finished examining the documents and Sergeant Johnson identified seven children for whom no documents were produced. *Id.* at 23; Plaintiffs' Ex. "E", Affidavit of Sergeant George Johnson at 4. Sergeant Johnson then discussed with defendants Sieck and Levingston the possibility of giving the Snells twenty-four (24) hours to produce documentation. Plaintiffs' Ex. "D", Deposition of Sharon Snell at 23–25; Plaintiffs' Ex. "E", Affidavit of Sergeant George Johnson at 4. Sergeant Johnson, after talking to defendants Sieck and Levingston, then made the decision to remove the seven children pursuant to the directive in Judge Brown's order. Plaintiffs' Ex. "D", Deposition of Sharon Snell at 33; Plaintiffs' Ex. "E", Affidavit of Sergeant George Johnson at 4.

70. Defendant Levingston asked about Patricia Turtle, an Indian child staying with the Snells. Defendant Sieck then made the comment to a police officer that "no Indian tribe would ever leave a child in this home." Plaintiffs' Ex. "D", Deposition of Sharon Snell at 26.

71. One of the children, Shannon, ran up the stairs. Defendant Sieck went upstairs after him and, according to Mrs. Snell, pulled him by the arm down the stairs. Plaintiffs' Ex. "D", Deposition of Sharon Snell at 31–33.

72. The children were being taken out of the house and the question was asked whether there were any blankets for the children to protect them from the rain. According to Mrs. Snell, Levingston remarked: "Children of this culture are used to the elements." *Id.* at 35.

73. At approximately 7:30 p.m. the police officers and DHS employees left the Snell home and transported the seven children to the Oklahoma County Juvenile Shelter. Plaintiffs' Ex. "E", Affidavit of Sergeant George Johnson at 5.

74. At the hearings on August 27, 28 and 31, DHS was unable to come forward with any evidence whatsoever to support the pornography or prostitution allegations contained in the August 26, 1987 Application. *See* Plaintiffs' Ex. "O", Transcript of Proceedings before Judge Brown, Aug. 27, 28 and 31, 1987.

## V. DEFENDANTS' ABSOLUTE IMMUNITY DEFENSE

Defendants contend they are entitled to absolute immunity from liability for claims under Title 42 U.S.C. § 1983 because their conduct in the performance of child protective functions was adversarial in nature and intimately associated with the judicial phase of the juvenile court's jurisdiction. Brief in Support of Summary Judgment of Defendants at 37.

There is no doubt that prosecutors are absolutely immune from Section 1983 civil rights liability in initiating a prosecution and in presenting the state's case. *Imbler v. Pachtman,* 424 U.S. 409, 432, 96 S.Ct. 984, 996, 47 L.Ed.2d 128 (1976); *Martinez v. Chavez,* 574 F.2d 1043, 1044 (10th Cir. 1978) (per curiam); *see also Briscoe v. La Hue,* 460 U.S. 325, 345–46, 103 S.Ct. 1108, 1120–21, 75 L.Ed.2d 96 (1983) (police who allegedly perjure themselves on witness stand can claim absolute immunity under Section 1983); *Butz v. Economou,* 438 U.S. 478, 515, 98 S.Ct. 2894, 2915, 57 L.Ed.2d 895 (1978) (Department of Agriculture officials performing certain functions analogous to prosecutors can claim absolute immunity); *Pierson v. Ray,* 386 U.S. 547, 553–54, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1967) (Section 1983 does not abrogate absolute immunity of state judges); *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872) (federal judges have absolute immunity); *Meade v. Grubbs,* 841 F.2d 1512, 1532–33 & n. 18 (10th Cir.1988) (Commissioner of State Department of Health

and Attorney General may claim absolute immunity with respect to declining to initiate criminal and civil proceedings).

Defendants argue that filing the Application containing allegations including child prostitution and child pornography, and pursuing the enforcement of the consequent Order were quasiprosecutorial acts eliciting absolute immunity.

The Court notes that the Tenth Circuit has not addressed this specific issue. *Cf. Clulow v. Oklahoma,* 700 F.2d 1291, 1298 (10th Cir.1983) ("bar officials charged with the duties of investigating, drawing up, and presenting cases involving attorney discipline enjoy absolute immunity"). The Court further notes that only the Ninth Circuit has squarely decided this issue and has ruled in favor of absolute immunity under limited circumstances. *Meyers v. Contra Costa County Dept. of Social Serv.,* 812 F.2d 1154, 1156 (9th Cir.) (social worker granted absolute immunity in initiating and pursuing child dependency proceedings against father; but not for actions prior to judicial intervention), *cert. denied,* — U.S. —, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987); *cf. Kurzawa v. Mueller,* 732 F.2d 1456, 1458 (6th Cir.1984) (social worker has absolute immunity for filing a negligence petition).

Two federal district courts in Oklahoma have found absolute immunity for social workers under circumstances different than those present in this case. *Compare Snook v. Lunsford,* No. 87–C–550–B, — F.Supp. — (N.D.Okla. May 24, 1988) (DHS employee granted absolute immunity for temporary custody action involving a mother leaving state and negligently entrusting six-year-old child to two minor siblings) *with Guest v. Moore,* No. CIV–85–1458–R, — F.Supp. —, (W.D.Okla. June 24, 1987) (DHS workers granted absolute immunity for failure to initiate a judicial hearing within the statutory time following an emergency detention of a suspected abused child) *and Fan v. Gaston,* No. 85–C–716–E, — F.Supp. —, (N.D.Okla. July 23, 1987) (juvenile court case worker granted absolute immunity for filing affidavit to obtain arrest warrant); *see generally* Annotation, *Failure of State or Local Government Entity to Protect a Child Abuse Victim as Violation of Federal Constitutional Right,* 79 A.L.R.Fed. 514 (1986 & Supp.1987).

█ This Court believes that social workers and their supervisors who are investigating claims of child abuse are analogous to federal investigative agents and police officers who may claim only qualified immunity arising out of their investigative efforts. *See, e.g., Martinez v. Winner,* 771 F.2d 424, 442 & 444 (10th Cir.1985). While the tasks of social workers who investigate child protection matters are clearly matters of compelling interest and importance to the public, how can it be said that when these investigators allegedly violate a citizen's constitutional rights they are entitled to absolute immunity, when highly trained FBI, DEA and Treasury agents facing identical allegations are entitled to only qualified immunity? This argument simply cannot stand. For this reason, the affirmative defense of absolute immunity of defendants Asbury, Levingston, Swepston, and Sieck must be denied.

█ The only extensions of the carefully carved grants of absolute immunity have been for government employees who perform functions analogous to prosecutors. *See, e.g., Imbler v. Pachtman,* 424 U.S. at 431–32 & n. 33, 96 S.Ct. at 995–96 & n. 33. The only employee with even a colorable role in the prosecutorial function would be defendant Padley, the DHS attorney who filed the August 26, 1987 Application. However, prosecutorial absolute immunity is limited, and the Tenth Circuit has held that "a prosecutor acting as an investigator has only qualified immunity." *Rex v. Teeples,* 753 F.2d 840, 843 (10th Cir.), *cert. denied sub nom.,* 474 U.S. 967, 106 S.Ct. 332, 88 L.Ed.2d 316 (1985), *quoted in Meade v. Grubbs,* 841 F.2d at 1532; *see Harlow v. Fitzgerald,* 457 U.S. 800, 811 n. 16, 102 S.Ct. 2727, 2734 n. 16, 73 L.Ed.2d 396 (1982); *see also* Annotation, *When is Prosecutor Entitled to Absolute Immunity from Civil Suit for Damages under 42 U.S.C. Sec. 1983: Post–Imbler Cases,* 67 A.L.R.Fed. 640 (1984 & Supp.1987).

■ The Court finds that the Application filed by defendant Padley was in furtherance of an investigation only, and therefore absolute immunity does not apply. *See Rex v. Teeples*, 753 F.2d at 843. Even if Padley's filing of the Application could be characterized as "prosecutorial" rather than "investigative", the Court would nevertheless decline to find absolute immunity for a DHS attorney who ventured outside her normal duties to perform a quasi-prosecutorial function. Significantly, the act by defendant Padley was completely unique, as she admitted she had never filed such an application before. Oklahoma law and long established practice envisions that the District Attorney shall perform such acts on behalf of DHS. In this case, the District Attorney's Office was openly hostile to filing a petition or complaint against the Snells because of a lack of evidence. Immunity grounds are carefully drawn and are to be strictly construed. Padley is not entitled to absolute immunity. Accordingly, the Court holds that absolute immunity is DENIED as to all defendants.

## VI.  DEFENDANTS' QUALIFIED IMMUNITY DEFENSE

■ The question of whether defendants are entitled to qualified immunity is a legal issue to be decided by the Court. *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir.1988). Once the affirmative defense has been raised, plaintiffs must come forward and identify both the clearly established law that the government officials allegedly violated and the conduct which violated that law. *Coen v. Runner*, 854 F.2d 374, 377 (10th Cir.1988). Only then must the government officials demonstrate that no material issues of fact remain as to whether their conduct was objectively reasonable in light of the law and information they possessed at the time. *Id.* Thus, before undertaking any analysis of the objective reasonableness of defendants' conduct, the Court must determine if plaintiffs have cleared the first hurdle by identifying clearly established constitutional rights that defendants allegedly violated. For the reasons set forth below, the Court finds that plaintiffs have failed in this regard with respect to several of their claims.

*A. Plaintiffs' Due Process Claims Under the Fifth and Fourteenth Amendments, and Privacy Claims*

### 1.  The Parties' Contentions

In Counts V and VI plaintiffs allege that defendants deprived them of the protection of due process of law pursuant to the fifth and fourteenth amendments. In Count VIII plaintiffs allege that defendants injured plaintiffs' name and reputation and deprived plaintiffs of their right to privacy in their family relations. The Snells claim they had a constitutionally protected liberty interest in maintaining their relationship with the seven children who were removed from the Snells' home on August 26, 1987. The Snells claim they were acting *in loco parentis* to these seven children, and analogize their relationship to that of foster parents in which, plaintiffs claim, there is a constitutionally protected liberty interest. Thus, plaintiffs claim the defendants were required to respect plaintiffs' liberty interest and to afford plaintiffs due process. *See* Plaintiffs' Objection to Defendants' Motion for Summary Judgment and Revised Brief at 31–35.

Defendants contend there was no relationship between the Snells and the seven removed children that warrants constitutional protection, and further contend that even foster parents have no constitutionally protected liberty interest in a foster family relationship. At the least, defendants claim, there is no clearly established right under the fifth or fourteenth amendments to due process relating to the removal of foster children from a foster home. *See* Brief in Support of Motion for Summary Judgment of Defendants at 23–26.

### 2.  Analysis

The rights of liberty and privacy that the Snells rely upon are not clearly spelled out in the constitution. They have been variously described as "penumbras" emanating from the Bill of Rights, "zones of privacy" implicit in the fourteenth amendment's concept of liberty, or as "the right to be let

alone." *Grusendorf v. City of Oklahoma City*, 816 F.2d 539, 540–41 (10th Cir.1987) (citations omitted).

These rights of liberty and privacy have been recognized only under limited circumstances. The Supreme Court has stated that "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' are included in this guarantee of personal liberty." *Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973) (citation omitted). The Supreme Court outlined the current reach of these interests "as embracing personal decisions relating to marriage, procreation, contraception, family relationships, child rearing and education." *Grusendorf v. City of Oklahoma City*, 816 F.2d at 541 (citing *Carey v. Population Serv. Int'l*, 431 U.S. 678, 685, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977)).

Plaintiffs have unsuccessfully attempted to place themselves within the ambit of the recognized interests involving family relationships. The Snells admit their alleged liberty interest concerning their relationship with the seven removed children is not superior to or even coextensive with the liberty interest natural parents have with their children. Plaintiffs' Objection to Defendants' Motion for Summary Judgment and Revised Brief at 34. The Snells urge, however, that they are in a position similar to that of foster parents, and that the law is clearly established that foster parents have a constitutionally protected liberty interest in maintaining their relationships with foster children.

As discussed below, the Court finds as a matter of law that the Snells do not have a constitutionally protected liberty or privacy interest in maintaining their relationship with the seven removed children.

The Supreme Court considered the issue of whether foster parents possess a constitutionally protected liberty interest in maintaining the foster family relation in *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (hereinafter *"OFFER"*). In *OFFER* the Court noted two important distinctions between foster family relationships and natural family relationships: (1) the source of the former is contractual in nature and is limited by the state through foster care agreements; and (2) there is virtually an unavoidable tension between protecting the liberty interest of natural parents while at the same time extending the rights of foster parents. *Gibson v. Merced County Dept. of Human Resources*, 799 F.2d 582, 586 (9th Cir.1986) (citing *OFFER*, 431 U.S. at 845–46, 97 S.Ct. at 2110–11). The Supreme Court in *OFFER* found it unnecessary to decide whether foster parents have a protected liberty interest, since the Court based its decision on other grounds. *OFFER*, 431 U.S. at 847, 97 S.Ct. at 2111. Justice Stewart, however, in a concurring opinion, stated that he would squarely hold that foster parents' interests are not of a kind that the due process clause of the fourteenth amendment protects. The state "confers no right on foster families to remain intact, defeasible only upon proof of specific acts or circumstances," nor does the state provide a "basis for a justifiable expectation on the part of foster families that their relationship will continue indefinitely." *OFFER*, 431 U.S. at 859–860, 97 S.Ct. at 2117–18.

The Fifth, Sixth, and Seventh Circuits have relied on *OFFER*, to support holdings that foster parents do not possess a constitutionally protected liberty interest in the maintenance of the foster family relationship. *Drummond v. Fulton County Dept. of Family and Children's Serv.*, 563 F.2d 1200, 1207 (5th Cir.1977), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1141 (1978); *Sherrard v. Owens*, 644 F.2d 542, 543 (6th Cir.), *cert. denied*, 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981); *Kyees v. County Dept. of Public Welfare*, 600 F.2d 693, 699 (7th Cir.1979).

In the case cited by plaintiffs, *Brown v. County of San Joaquin*, 601 F.Supp. 653 (E.D.Cal.1985), the district court relied on *OFFER* to reach the opposite result, concluding that foster family relationships are sufficiently similar to other familial relationships to be entitled to constitutional protection. *Brown v. County of San Joa-*

*quin,* 601 F.Supp. at 665. The district court in *Brown v. County of San Joaquin* expressly rejected the holdings of the Fifth Circuit in *Drummond* and the Seventh Circuit in *Kyees. Brown,* 601 F.Supp. at 665.

Thus, if the law in this area is "clearly established," it would seem to be established in favor of defendants' position in the instant case. Moreover, if the law in this area is not yet "clearly established", defendants still prevail because plaintiffs failed to clear the first hurdle in the qualified immunity analysis.

■ This Court follows the majority of jurisdictions which have held that foster parents do not possess a constitutionally protected liberty interest in the maintenance of a foster family relationship. *Drummond v. Fulton County Dept. of Family & Children's Serv., Sherrard v. Owens, Kyees v. County Dept. of Welfare.* Plaintiffs have not established through the evidence presented that they are entitled to more protection than foster parents. If anything, the Snells' relationship with the seven removed children is even more attenuated than that of foster parents.

None of the seven removed children were the natural or adopted children of the Snells. Moreover, none of the remaining children plaintiffs in this case were among the seven children removed from the home on August 26, 1987. While the Snells clearly have a constitutionally protected liberty interest in maintaining their familial relationship with their natural and adopted children, a review of the Amended Complaint reveals that the only allegation regarding the children who were *not* removed is as follows:

The children who remained at home were also made to experience the terror of seeing the other children removed in the fear and anticipation that they too would be snatched from the security of their home and family. Plaintiffs were forced to experience the removal against their will of children from their home, children whom they had sworn to protect and to nurture, but whom they were helpless to shield from harm. The only reason given by defendants for the abrupt, arbitrary and forced removal of the seven black children was that the custody papers signed by their mothers had not also been signed by a judge.

Amended Complaint at 7, ¶ 9.

The Court finds that the above allegation, assuming *arguendo* its truth, does not to plaintiffs' liberty interest claims, but rather, if at all, to plaintiffs' fourth amendment claims discussed below, wherein plaintiffs allege that the reasonable expectation of privacy they had in their home was violated by defendants' conduct.

Accordingly, the Court finds as a matter of law that with regard to Counts V, VI and VIII, plaintiffs have failed to identify any clearly established constitutional rights which defendants violated, and summary judgment is GRANTED in favor of all defendants on the due process and privacy claims.

### B. Plaintiffs' Fourth Amendment Claims

The plaintiffs, in Counts III and IV of their Amended Complaint, allege that defendants have deprived the Snells and the remaining seven children plaintiffs of their right to be secure in their house, papers and effects against unreasonable searches and seizures as provided by the fourth amendment.[9] Defendants contend they did not violate any clearly established particularized fourth amendment strictures. Brief in Support of Motion for Summary Judgment of Defendants at 20–23.

Defendants cite cases which indicate that "there is a substantial question whether warrantless home visits by social workers investigating claims of child abuse violate the Fourth Amendment." *Donald M. v. Matava,* 668 F.Supp. 703, 709 (D.Mass. 1987); *see also Darryl H. v. Coler,* 801 F.2d 893 (7th Cir.1986). Brief in Support of Motion for Summary Judgment of Defend-

---

**9.** As indicated previously, the children who were "seized" or removed from the Snell home on the evening of August 26, 1987, are no longer plaintiffs, having announced settlement of their claims.

ants at 21–23. Based on these cases, defendants argue that "it cannot follow that since social workers in this case accompanied police officers acting pursuant to a court order directing plaintiffs' cooperation with defendants' investigation, defendants should have known that their conduct violated the Fourth Amendment." Brief in Support of Motion for Summary Judgment of Defendants at 22. The problem with this analysis is that the Court Order in question was procured through the presentation of false information to a judicial officer.

In the instant case, the plaintiffs, in an effort to meet their burden, have identified the law that the government officials are alleged to have violated as the fourth amendment right to be free from unreasonable searches and seizures and have argued that the entry into the plaintiffs' home on August 26, 1987 violated this law. It is undisputed that the plaintiffs have a reasonable expectation of privacy in their home, and that the Snells did not forfeit their fourth amendment protection merely by operating an emergency shelter home. The nature and extent of plaintiffs' fourth amendment protection, however, is the subject of much dispute between the parties.

At the outset, the Court rejects defendants' argument that the Order of Judge Brown, which authorized entry into the Snell home, relieves the defendants from potential liability. The alleged unreasonableness of the defendants' conduct is not lessened by the fact that Judge Brown issued an order authorizing entry. In *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), the United States Supreme Court rejected the contention that the actions of a magistrate in issuing a warrant shielded a police officer from liability. Here, the reasonableness of the defendants' conduct must stand or fall on defendants' own actions because, viewing the evidence in the light most favorable to plaintiffs, Judge Brown's Order was issued based upon intentional or reckless misrepresentations generated by defendants Padley, Levingston, Sieck and Swepston. Indeed, a fair reading of Judge Brown's testimony is that it was the child pornography

and prostitution allegations which "sucked [him] into" issuing his August 26, 1987 Order. It might also be inferred that the pornography and prostitution allegations constituted evidence of an "emergency" invented by the defendants to get them over the hump of their previously unsuccessful efforts to obtain a pickup order for the children. *See* factual analysis finding No. 35 *supra.*

The parties agree that the "clearly established law" is grounded in the fourth amendment. The defendants, however, seem to argue (and thus, the plaintiffs have attempted to refute) that probable cause is not necessary to support an order authorizing entry into a home in a child abuse or child custody context. This law *probably* is *not* clearly established. *See, e.g., Donald M. v. Matava*, 668 F.Supp. 703 (D.Mass. 1987).

This Court, however, should not reach the issue of what level of evidence is, or is not, necessary to support a finding of probable cause for the issuance of a warrant or order in a child abuse investigation. Likewise, this Court should not decide whether probable cause is the requisite standard for the issuance of a warrant or order in such an investigation.

Rather, the Court should focus its attention and issue its ruling based only upon the factual allegations that Judge Brown's Order was obtained through the use of false information. This sort of conduct— intentionally providing false and misleading information to a judicial officer for the purpose of securing a warrant or order authorizing entry into a home—violates the fourth amendment in *any* official investigative context. No court has ever declared otherwise.

The defendants do not contend, nor could they contend, that the child pornography and prostitution allegations contained in paragraph 1 of the August 26, 1987 DHS Application were true. Indeed, counsel for defendants at oral argument on October 24, 1988 candidly acknowledged that paragraph one of the Application was false. Moreover, defendant Padley, who prepared

the Application, has testified that she had no idea whether the information set forth in the Application was true or false.

Counsel for defendants nevertheless suggested at the hearing on October 24, 1988 that there was insufficient evidence of intent to send the case to trial, urging that the false information presented to Judge Brown was the result of "miscommunication", and was not the product of intentional unlawful conduct. While this may be true, it is, however, a well established maxim that the Court may not weigh evidence at the summary judgment stage. Moreover, issues of intent are rarely resolved at the summary judgment stage, especially in civil rights cases, where district judges are repeatedly warned by appellate courts to proceed with caution.

■ Here, viewing the evidence in the light most favorable to the plaintiffs, defendants Padley, Sieck, Levingston and Swepston embarked on a course of conduct on August 26, 1987 which involved the intentional presentation of false information to the Presiding Judge of the Juvenile Division of the District Court for the purpose of obtaining entry into the Snell home. Moreover, the evidence before the Court at this time clearly suggests that the prostitution and pornography allegations were the determinative factor in obtaining the Order from Judge Brown. Although it is now clear that the Snells were never the subject of such an investigation, Padley's Application nevertheless led Judge Brown to believe that such improprieties were occurring at the Snells' household. Moreover, the defendants involved in the events of August 26, 1987 arguably had every reason to believe that the alleged licensing violations did not afford a basis for seizure of the children, because DHS had previously (and unsuccessfully) sought to pick up the children on this ground.

As a direct result of the false information presented, defendants Levingston and Sieck obtained entry into the Snell home after ordinary business hours and in the company of uniformed officers. Also, viewing the evidence under the standard outlined above, defendants' course of conduct was in direct conflict with a variety of standing DHS procedures, providing further arguable indicia of improper intent. Finally, DHS' complete failure to justify the allegations in paragraph one of the Application at the hearings held in the Juvenile Division of the District Court on August 27, 28 and 31, 1987 further underscores the inadequacy of defendants' fourth amendment qualified immunity defense at the summary judgment stage.

The defense of qualified immunity is grounded upon objective reasonableness. Here, if plaintiffs' evidence is believed, false allegations were presented to a judge for the specific purpose of obtaining entry into the Snell home, such entry the defendants believed could not be accomplished without the presentation of the pornography and prostitution allegations to a judicial officer. The parties responsible for presenting these allegations were unable to substantiate them, not only at the state court hearings held after the August 26, 1987, search but even now. Regardless of whether the Court utilizes a probable cause standard or something less, official intrusions by social workers must comply with the reasonableness requirement of the fourth amendment. To place the label of "objective reasonableness" on·the deliberate or reckless presentation of false information to a judicial officer for the purpose of obtaining entry into one's home defies reason, and would destroy the protection provided by the fourth amendment.[10] The qualified immunity doctrine was never intended to shield such conduct or to grant DHS officials such sweeping powers.

---

10. *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *Franks v. Smith,* 717 F.2d 183 (5th Cir.1983); *United States v. Strauss,* 678 F.2d 886, 893 (11th Cir.1982). Even administrative searches, for which probable cause is not required, necessi-

tate a showing of reasonableness. *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) ("reasonableness is still the ultimate standard"); *Wyman v. James,* 400 U.S. 309, 316–17, 91 S.Ct. 381, 385–86, 27 L.Ed.2d 408 (1971).

In summary, the Court finds that a Section 1983 action can lie against social workers under the fourth amendment where false information is either deliberately or recklessly presented to a judicial officer for the purpose of obtaining entry into a home under the circumstances of this case. Plaintiffs have met the burden of identifying the clearly established law: the right under the fourth amendment to be secure in one's home from *unreasonable* searches and seizures premised on falsified information presented to judicial officers. The "unreasonableness" in this case is *not* evaluated by whether probable cause is required (or even whether it existed since the information from which to determine probable cause was allegedly false), *but* by whether the evidence provided to obtain the Order was true, or reasonably thought to be true or was knowingly and intentionally false or provided in reckless disregard of whether it was true or false. On this point, the Court finds there are substantial questions of fact which must be resolved by a jury.

Accordingly, the defendants who participated in the events of August 26, 1987 (Padley, Levingston, Sieck and Swepston) are not entitled to qualified immunity.[11] As set forth in more detail in the conspiracy discussion below, there is no evidence defendant Asbury either directed, approved or agreed to the course of action undertaken by the other defendants on August 26, 1987 and accordingly, defendants' summary judgment motion is GRANTED on plaintiffs' fourth amendment claims as to defendant Asbury only.

### C. Plaintiffs' Conspiracy Theory

Plaintiffs contend that defendants conspired to deprive them of constitutionally protected rights in violation of Title 42 U.S.C. § 1983. Plaintiffs do not set out a specific count alleging a conspiracy in violation of Section 1983, and nowhere in their Amended Complaint are there any allegations of a conspiracy in violation of Section 1983. The only allegation of conspiracy in plaintiffs' Amended Complaint (other than Count II, paragraphs 16–17, alleging a violation of Section 1985, which plaintiffs dismissed with prejudice on September 20, 1988) is contained in paragraph 13 and reads as follows:

> Plaintiffs allege on information and belief that the defendants DHS and DHS employees, conspired to discredit plaintiffs, used the alleged "investigation" as a ploy, and held the children hostage while they tried to unearth even a shred of evidence to support their spurious allegations.

Plaintiffs' Amended Complaint at 8, ¶ 13.

There is a serious question as to whether plaintiffs have properly preserved a Section 1983 conspiracy claim for trial. Plaintiffs filed an Amended Complaint on February 25, 1988, but did not amend their Complaint as it related to the alleged conspiracy. Amended Complaint, February 25, 1988, ¶ 13 and Count II. Plaintiffs did not amend or attempt to amend their Complaint on or before June 1, 1988, the last day for amendment of pleadings under the Court's Scheduling Order of January 29, 1988. In plaintiffs' final contentions, general non-conspiratorial assertions of violations of fourth, fifth and fourteenth amendment rights were stated in terms similar to those of the Amended Complaint. Plaintiffs' Final Contentions, ¶¶ 1, 2, 21–23;

---

**11.** Defendant Swepston did not participate personally in the "search" of the Snell home on August 26, 1987. Nevertheless, summary judgment on behalf of Swepston is denied because Swepston, viewing the evidence in the light most favorable to the plaintiffs (1) met with Padley, Levingston and Sieck on August 26, 1987 to discuss the filing of the Application with Judge Brown; (2) allegedly threatened Snell with retaliation for complaining about a breach of DHS confidentiality; (3) signed an allegedly altered report of David McLain which had previously been submitted to Assistant District Attorney McNeese; (4) allegedly provided Detective Einhorn with false information concerning the Snells' involvement with pornography; (5) was aware of the ongoing attempt by DHS to get the children out of the Snell home; and (6) met with defendants Levingston and Sieck to review Judge Brown's Order prior to the search on August 26, 1987. Swepston, as a supervisor who was allegedly aware of the false accusations which were being presented to Judge Brown, arguably "participated or acquiesced" in the constitutional deprivation alleged. *Meade v. Grubbs,* 841 F.2d 1512, 1528 (10th Cir.1988).

Plaintiffs' Amended Complaint, Counts III–VI, at 12–13.

On July 20, 1988, plaintiffs filed their Objection to Defendants' Motion for Summary Judgment and Brief in Support (a Revised Brief was filed July 29, 1988). In their Objection, plaintiffs described this case as one in which "plaintiffs claim that defendants violated their rights under Articles [sic] I, IV, V and XIV of the Constitution of the United States." The defendants contend after review of the pleadings to date that plaintiffs abandoned their conspiracy claim. Defendants' Brief In Reply to Plaintiffs' Objection to Defendants' Motion for Summary Judgment at 1–2. Plaintiffs, however, resurrected their conspiracy theory again in supplemental filings to the summary judgment motion.

In the Final Pretrial Order in this case, submitted October 4, 1988, plaintiffs again refer to a "conspiracy to discredit Clark and Sharon Snell", Final Pretrial Order at 2, and contend that "[d]efendants met in one or more groups and conspired together to put pressure on the Snells to submit to the control of DHS." Final Pretrial Order at 21. Plaintiffs added the general conclusion that the defendants "conspired to violate the plaintiffs' constitutional rights." *Id.* Plaintiffs did not identify their conspiracy claim with any specific constitutional claim or with any specific constitutional right and made no reference to the first or fourth amendments in their final contentions.

On October 11, 1988, the Court issued an Order directing plaintiffs to file a supplemental response clarifying plaintiffs' conspiracy theory. As indicated earlier, the plaintiffs' submission on October 18, 1988 did little to clarify the conspiracy theory. The plaintiffs' October 18, 1988 filing could arguably be interpreted to claim a conspiracy to discredit the Snells, as well as a conspiracy to violate plaintiffs' first and fourth amendment rights. But for the abundance of case law which urges caution in the dismissal of civil rights conspiracy claims, the Court would not hesitate to dismiss this claim of plaintiffs, which can only be described as a "moving target".

At oral argument on October 11, and October 24, 1988 plaintiffs' counsel again described the Section 1983 allegation as a "conspiracy to discredit plaintiffs." This case, however, is not a state defamation lawsuit. To the contrary, it is a Section 1983 action alleging deprivation of clearly established constitutional rights. Plaintiffs have totally failed to persuade the Court that their alleged "conspiracy to discredit" is a viable civil rights action under Section 1983. If a legitimate conspiracy count can be inferred from the broad language in plaintiffs' Amended Complaint, the only such right arguably established by plaintiffs involves their fourth amendment claims.

To survive a motion for summary judgment on a conspiracy allegation, plaintiffs must show the existence of a conspiratorial agreement among the various defendants. *Hammond v. Bales*, 843 F.2d 1320, 1324 (10th Cir.1988). Viewing the evidence in the light most favorable to the plaintiffs, their fourth amendment conspiracy claim in this case can only go forward against defendants Padley, Levingston, Swepston and Sieck. These are the only remaining defendants who either participated or acquiesced in the events of August 26, 1987, the date of the alleged fourth amendment violation. As set forth below, however, plaintiffs have failed to demonstrate a triable issue on their fourth amendment claims as to defendant Asbury.

Defendant Asbury, in her motion for summary judgment, came forward with affirmative evidence that she was not involved in the events of August 26, 1987, nor was she even aware that an Application was going to be filed with the Court by DHS until well after the removal of the children from the Snell home. Plaintiffs have come forward with no evidence rebutting these allegations or establishing in any way Asbury's personal participation in the events of August 26, 1987. Instead, viewing the evidence in the light most favorable to the plaintiffs, plaintiffs have established that Asbury was clearly exploring a variety of possible avenues of intervention by DHS, and that she assisted in creating an

atmosphere of rumor and innuendo that ultimately found its way into paragraph one of the DHS' August 26, 1987 Application to Judge Brown.

However, there is no showing that Asbury participated in obtaining the August 26, 1987 Order from Judge Brown, or that she agreed with anyone to pursue the course of action undertaken by the other defendants on August 26, 1987. Asbury did not direct Einhorn to talk to Judge Brown on August 26, 1987 nor did Asbury direct anyone to submit an Application to the Court. Moreover, contrary to plaintiffs' suggestions, there is no doctrine of *respondeat-superior* in civil rights cases. *Meade v. Grubbs*, 841 F.2d 1512 (10th Cir. 1988). The plaintiffs' contention that defendants Asbury and Tunnell "quarterbacked" the events of August 26, 1987 is transparent speculation.

During the hearing on October 24, 1988 plaintiffs' counsel made reference to the *"Briggs* case" for the proposition that defendant Asbury had a duty to act to prevent misconduct on the part of DHS employees under her supervision, thus arguing that even though Asbury didn't participate in the events of August 26, 1987, supervisory liability should be imposed upon her for failing to prevent those events. The Court's review of the *Briggs* case, *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), reveals that it does not address the issue of supervisory liability. Rather, it addresses absolute and qualified immunity.

Plaintiffs' attorney may have meant to refer to the *"Grubbs* case" instead of "the *Briggs* case". *Meade v. Grubbs*, 841 F.2d 1512 (10th Cir.1988) does address supervisory liability. *Id.* at 1527–28. *Meade* held that to be liable under Section 1983, a supervisor must have "participated or acquiesced in the constitutional deprivations" alleged. *Id.* at 1528. Here, there is unrefuted evidence that Asbury neither participated in nor acquiesced in the events of August 26, 1987, the date of the alleged fourth amendment violation. *Meade* also held that a supervisor may be liable "where there is essentially a complete failure to

train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Id.* Here, there is not even an allegation that Asbury had a duty to train the other defendants, much less that she failed to adequately train them.

Finally, *Meade* held that "unless a supervisor has established or utilized an unconstitutional policy or custom [which is not alleged in the instant case], a plaintiff must show that the supervisory defendant breached a duty imposed by state or local law which *caused* the [alleged] constitutional violation." *Id.* Here, plaintiffs have made no showing Asbury violated any state or local law that any reasonable jury could find "caused" the events of August 26, 1987.

■ Asbury's pre-August 26, 1987 conduct, while arguably unprofessional, cannot be said to be in violation of any clearly established constitutional rights of plaintiffs. Nor did Asbury participate in the alleged fourth amendment violation. Absent an evidentiary showing from which Asbury's conspiratorial agreement in the allegedly unlawful search of August 26, 1987 can be inferred, summary judgment is mandated. *Hammond v. Bales*, 843 F.2d at 1324. Accordingly, defendant Asbury's motion for summary judgment as to plaintiffs' conspiracy claim is GRANTED.

On the other hand, the same evidence which supports the denial of defendants Padley, Levingston, Swepston and Sieck's motion for summary judgment on plaintiffs' fourth amendment claim, also supports an inference that these defendants undertook this course of conduct in furtherance of an agreement to violate plaintiffs' clearly established fourth amendment rights. Accordingly, defendants' motion for summary judgment on the plaintiffs' fourth amendment conspiracy claim is DENIED as to defendants Padley, Levingston, Swepston and Sieck.

## VII. CONCLUSION

For the above stated reasons, defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Absent a stay of this matter, jury

selection on the remaining fourth amendment claim and conspiracy claim against defendants Padley, Swepston, Sieck, and Levingston will begin November 2, 1988 at 9:00 o'clock a.m.